Dennis James PAUSCHER, Administrator for the Estate of Becky Gay Pauscher, Appellant,

v.

IOWA METHODIST MEDICAL CENTER, Jeff Watters, and John Bardole, Appellees.

No. 86–364.

Supreme Court of Iowa.

June 17, 1987.

Rehearing Denied July 20, 1987.

R. Ronald Pogge of Hopkins & Huebner, P.C., Des Moines, for appellant.

Thomas A. Finley and Hugh J. Cain of Duncan, Jones, Riley & Finley, Des Moines, for appellee Iowa Methodist Medical Center.

John A. McClintock and David L. Brown of Hansen, McClintock & Riley, Des Moines, for appellee Jeff Watters.

Eugene Davis and Robert C. Rouwenhorst of Davis, Grace, Harvey, Horvath, Gonnerman & Rouwenhorst, Des Moines, for appellee John Bardole.

Considered by REYNOLDSON, C.J., and HARRIS, SCHULTZ, CARTER, and NEUMAN, JJ.

REYNOLDSON, Chief Justice.

The administrator of Becky Gay Pauscher's estate brought this wrongful death action against the defendant hospital and doctors, alleging Becky died as a direct result of a diagnostic procedure to which she had not given her informed consent. Trial court directed a verdict for defendants on the ground plaintiff had not produced testimony from medical experts to show that reasonable medical practice would have required her to be informed of the attendant risk of death. Plaintiff has

appealed. We affirm, although not on the basis of trial court's ruling.

August 1, 1982, Becky, age twenty-six, entered Iowa Methodist Medical Center (IMMC) to deliver her first child. The child, Brad, was born the next day and Becky was scheduled to be released August 6.

On the day she was to leave the hospital, Becky developed a fever and pain in her right side. She also began to discharge large amounts of blood in her urine. As a result, Becky's obstetrician, Dr. Mark, delayed her release and prescribed Macrodantin, a bacteriostatic drug.

Becky's symptoms continued on August 7, 1982. Dr. Mark telephoned defendant Dr. John Bardole, a urology specialist. The latter feared a potentially life-threatening obstruction might be present in Becky's urinary tract.

Bardole ordered intravenous administration of a more aggressive bacterial drug, Mandol. Blood tests were instituted. Bardole also ordered an intravenous pyelogram (IVP) to be run the next morning, August 8, to determine whether Becky's urinary tract was obstructed.

An IVP is a diagnostic procedure in which an iodine-containing contrast material, in this case Reno–M–60, is injected into the patient's veins. X-rays then taken of the urinary tract, highlighted by the dye material, often enable the physician to determine whether it is obstructed.

Administration of an IVP is not without risk. A relatively small percent of individuals will suffer some discomfort, including flushing, hives, and nausea. More serious reactions include significant trouble breathing and a severe drop in blood pressure. The record made in this trial also indicates 1 person in 100,000 to 1 person in 150,000 will die as a result of an IVP,[1] less often than fatal reactions to penicillin.

Before the IVP was administered neither Dr. Bardole nor defendant Dr. Jeff Watters, the only radiologist present in IMMC's radiology department on the Sunday morning Becky died, ever saw or talked to her. Two of the shift nurses who had attended Becky testified they separately told Becky she was to have an IVP and briefly described its purpose. One told Becky she could get a mild reaction, like hives, or a severe reaction, like difficult breathing. The other nurse described only the possibility of a mild reaction, "[j]ust the warmth of the dye, that sort of thing."

These discussions were noted in Becky's charts four days after her death, as "a late entry," at the request of a supervisor. Neither nurse was acting at the direction of a doctor in visiting with Becky about the IVP, neither nurse told her a severe reaction could include anaphylactic shock and death, and neither asked Becky if she consented to the procedure.

On the morning of August 8 Becky was taken to the radiology department for the IVP. A radiology technician testified she asked Becky some questions about allergies (apparently of some significance in reactions) and noted her responses on a "requisition slip," which later could not be found. This witness further testified Becky denied any allergies, although it ultimately appeared from her medical chart she had a bee sting allergy and there was evidence she had suffered from asthma as a child. This technician explained to Becky some of the more minor reactions to the dye that might occur, but did not tell Becky she could die as a result. Nor did the technician ask Becky if she consented to the procedure.

After some of the contrast material had been injected, Becky began to scratch her face. The technician halted the injection to check for further distress symptoms.

Determining no hives were present, the technician continued the procedure. Becky then complained of significant chest pains. The procedure was stopped at once and Dr. Watters was summoned. Despite substantial lifesaving measures, Becky soon died. An autopsy disclosed the cause of death to be anaphylactic shock directly induced by

---

1. Interestingly, evidence in *Pardy v. United States,* 783 F.2d 710 (7th Cir.1986), disclosed 1 in 14,000 patients suffer a severe reaction to an IVP; 1 in 40,000 dies. *Id.* at 711.

injection of the contrast material during the IVP. There was no obstruction in the urinary tract and the infection had been on the left side, not the right.

In this action the plaintiff, Becky's husband, the administrator of her estate, alleges Bardole and Watters failed to inform Becky about the possibility she could die from an IVP, and thus they failed to obtain her informed consent to the procedure. He also claims IMMC failed to adopt or carry out procedures sufficient to insure that Becky's informed consent was obtained before the IVP was administered.

At trial, plaintiff presented no expert testimony on the issue whether Bardole and Watters deviated from professional standards when they failed to inform Becky the administration of an IVP entailed a very remote risk of death. In the absence of such evidence the trial court, following our 1966 decision in *Grosjean v. Spencer*, 258 Iowa 685, 140 N.W.2d 139 (1966), granted the defendant doctors' motions for directed verdict. The court also granted IMMC's motion for directed verdict on the same ground, and apparently because the obligation to inform a patient of such risks is upon the doctor, not the hospital.

I. In this appeal we first address the issue whether the "patient rule" or the "professional rule" should apply in circumstances such as these. The two standards were identified and extensively discussed in *Cowman v. Hornaday*, 329 N.W.2d 422 (Iowa 1983), in which we applied the "patient rule" in a case of elective surgery. *Id.* at 424–27. We since have applied the same rule in *Moser v. Stallings*, 387 N.W.2d 599, 602 (Iowa 1986), an elective cosmetic surgery situation, and, apparently without it becoming an issue, in *Van Iperen v. Van Bramer*, 392 N.W.2d 480, 483 (Iowa 1986), a case that involved medication for a serious illness, not elective surgery.

As we noted in *Cowman*, the doctrine of informed consent arises out of the unquestioned principle that absent extenuating circumstances a patient has the right to exercise control over his or her body by

making an informed decision concerning whether to submit to a particular medical procedure. *Cowman*, 329 N.W.2d at 424–25; *see also Sard v. Hardy*, 281 Md. 432, 439, 379 A.2d 1014, 1019 (1977); *Smith v. Shannon*, 100 Wash.2d 26, 29–30, 666 P.2d 351, 354 (1983). Thus, a doctor recommending a particular procedure generally has, among other obligations, the duty to disclose to the patient all material risks involved in the procedure. *See Cowman*, 329 N.W.2d at 425; *Festa v. Greenberg*, 354 Pa.Super. 346, 353, 511 A.2d 1371, 1373 (1986); *Hook v. Rothstein*, 281 S.C. 541, 547, 316 S.E.2d 690, 694–95 (1984).

The "professional rule" we followed in *Grosjean* recognized the treating doctor's duty to "disclose danger of which he has knowledge and the patient does not—but should have—in order to determine whether to consent to the risk." *Grosjean*, 258 Iowa at 694, 140 N.W.2d at 145 (quoting *Watson v. Clutts*, 262 N.C. 153, 159, 136 S.E.2d 617, 621 (1964)). At the same time, however, we left the question whether that duty had been satisfied to the medical profession when we held this was "primarily a question of medical judgment." *Id.* Because there was no expert testimony that the treating doctor "failed to do that which should have been done in ... advising ... plaintiff ... [a] jury question on negligence was not created." *Id.* We thus affirmed a judgment based on a directed verdict for the defendant doctor.

Recognizing the inherently paternalistic and authoritarian nature of the professional rule of disclosure, an expanding number of jurisdictions have rejected it for a judicially-fashioned standard. *See, e.g., Canterbury v. Spence*, 464 F.2d 772, 779–92 (D.C. Cir.), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Cobbs v. Grant*, 8 Cal.3d 229, 241–46, 104 Cal.Rptr. 505, 512–16, 502 P.2d 1, 8–12 (1972); *Logan v. Greenwich Hosp. Ass'n*, 191 Conn. 282, 287–93, 465 A.2d 294, 298–301 (1983); *Crain v. Allison*, 443 A.2d 558, 561–64 (D.C.1982); *Goodwin v. Aetna Casualty & Sur. Co.*, 294 So.2d 618, 620 (La.App.1974); *Sard v. Hardy*, 281 Md. 432, 438–40, 379 A.2d 1014, 1019–20 (1977); *Harnish v.*

*Children's Hosp. Medical Center,* 387 Mass. 152, 153–57, 439 N.E.2d 240, 242–44 (1982); *Plutshack v. University of Minnesota Hosps,* 316 N.W.2d 1, 9 (Minn.1982); *Reikes v. Martin,* 471 So.2d 385, 392–93 (Miss.1985); *Gerety v. Demers,* 92 N.M. 396, 408–11, 589 P.2d 180, 192–95 (1978); *Nickell v. Gonzalez,* 17 Ohio St.3d 136, 138–40, 477 N.E.2d 1145 (1985); *Scott v. Bradford,* 606 P.2d 554, 557–60 (Okla. 1979); *Beauvais v. Notre Dame Hosp.,* 120 R.I. 271, 276, 387 A.2d 689, 691 (1978); *Wilkinson v. Vesey,* 110 R.I. 606, 627, 295 A.2d 676, 689 (1972); *Peterson v. Shields,* 652 S.W.2d 929, 931 (Tex.1983); *Small v. Gifford Memorial Hosp.,* 133 Vt. 552, 557, 349 A.2d 703, 706 (1975); *Smith v. Shannon,* 100 Wash.2d 26, 29–34, 666 P.2d 351, 354–56 (1983); *Miller v. Kennedy,* 11 Wash.App. 272, 281–88, 522 P.2d 852, 860–64 (1974), *aff'd,* 85 Wash.2d 151, 530 P.2d 334 (1975); *Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis.2d 1, 11–13, 227 N.W.2d 647, 652–54 (1975).

Similarly, the professional rule has come under a barrage of criticism from current commentators. *See, e.g.,* D. Seidelson, *Lack of Informed Consent in Medical Malpractice and Product Liability Cases: The Burden of Presenting Evidence,* 14 Hofstra L.Rev. 621 (1986); M. Shultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219 (1985); *see also* 2 Harper & F. James, *Law of Torts* § 17.1, at 60–61 (Supp.1968).

The authoritarian rationale that undergirds the professional rule is apparent in the record before us. Both defendant doctors testified the practice in the profession would be to avoid mentioning a risk of death to a patient scheduled for an IVP. Although both doctors took into consideration the remote chance of such a fatality—a factor we discuss later—both justified withholding this information on the ground it would produce an anxiety in the patient that might adversely affect the patient's condition during the procedure.

In this connection plaintiff's evidence disclosed the manufacturer's package insert accompanying the dye material contained no warning relating to a patient with anxiety, but did contain the following information:

Adverse reactions accompanying the use of iodine-containing intravascular contrast agents are usually mild and transient although severe and life-threatening reactions, including fatalities, have occurred. ...

. . . .

... [T]he histamine-liberating effect of these compounds may induce an allergic-like reaction which may range in severity from rhinitis or angioneurotic edema to laryngeal or bronchial spasm or anaphylactoid shock.

Each doctor, however, testified that if the patient asked what might happen, he would reply that the patient could die from the IVP. The professional rule thus provides this information for the patient already apprehensive enough to ask, but denies it to one so lacking in anxiety that he or she is not motivated to inquire. A rule resulting in such anomalous treatment of patients has little to commend it.

■ On the other hand, under the patient rule we adopted for elective surgery in *Cowman,* the physician's duty to disclose is measured by the patient's need to have access to all information material to making a truly informed and intelligent decision concerning the proposed medical procedure. *Cowman,* 329 N.W.2d at 425, 427; *see also Canterbury,* 464 F.2d at 786–87; *Van Iperen,* 392 N.W.2d at 483. In *Cowman* we concluded that in the elective surgery situation no valid reasons existed for allowing the medical community the exclusive determination of what information would be material to a patient's decision to consent to a particular medical procedure. *Cowman,* 329 N.W.2d at 427. Today we confirm, as we implied in *Van Iperen,* 392 N.W.2d at 483, that the patient rule is applicable in all informed consent cases, in both elective and nonelective medical procedures.

Compelling grounds justify this conclusion. The patient's right to make an intelligent and informed decision cannot be exercised when information material to that

decision is withheld. Although most aspects of the physician-patient relationship necessarily must be dominated by the superior skill and knowledge of the physician, the decision to consent to a particular medical procedure is not a medical decision. Instead, it ordinarily is a personal and often difficult decision to be made by the patient with the physician's advice and consultation. In order to make his or her informed decision, the patient has the right to expect the information reasonably necessary to that process will be made available by the physician. To force a layperson patient to prove the professional community's standard and its violation allows the exceptions to swallow the rule—the hallmark of the professional rule as demonstrated by this case—and forces the patient to prove the withholding of material information was not medically justified. In contrast, the patient rule makes full disclosure the rule but allows for numerous exceptions which the physician, who has access to the medical knowledge involved, can assert.

Adoption of the patient rule in all circumstances does not provide an easy burden for the patient, who generally must establish the following:

(1) The existence of a material risk unknown to the patient;

(2) A failure to disclose that risk on the part of the physician;

(3) Disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment;

(4) Injury.

*See Miller,* 11 Wash.App. at 283, 522 P.2d at 861. Further, the patient ordinarily will be required to present expert testimony relating to the nature of the risk and the likelihood of its occurrence, in order for the jury to determine, from the standpoint of the reasonable patient, whether the risk is in fact a material one. *Shannon,* 100 Wash.2d at 32–33, 666 P.2d at 356.

As we noted in *Cowman,* a number of situations may be established by the defendant physician as a defense to an informed consent action, constituting ex-

ceptions to the duty to disclosure. These include:

(1) Situations in which complete and candid disclosure might have a detrimental effect on the physical or psychological well-being of the patient;

(2) Situations in which a patient is incapable of giving consent by reason of mental disability or infancy;

(3) Situations in which an emergency makes it impractical to obtain consent;

(4) Situations in which the risk is either known to the patient or is so obvious as to justify a presumption on the part of the physician that the patient has knowledge of the risk;

(5) Situations in which the procedure itself is simple and the danger remote and commonly appreciated to be remote;

(6) Situations in which the physician does not know of an otherwise material risk and should not have been aware of it in the exercise of ordinary care.

*Cowman,* 329 N.W.2d at 426.

Dr. Bardole's brief contends for the professional rule "as a matter of public policy," on the ground the decision to withhold information from the patient, for the patient's best interests, is a uniquely medical judgment call to be measured by what physicians under similar circumstances do. The most definitive statement of public policy on this issue, however, is that adopted by the Iowa Legislature in Iowa Code section 147.137:

A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of this section *shall create a presumption that informed consent was given.* A consent in writing meets the requirements of this section if it:

1. Sets forth in general terms the nature and purpose of the procedure or procedures, *together with the known risks, if any, of death,* brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures, *with the proba-*

*bility of each such risk if reasonably determinable.*

2. Acknowledges that the disclosure of that information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner.

3. Is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, is signed by a person who has legal authority to consent on behalf of that patient in those circumstances.

Iowa Code § 147.137 (1981) (emphasis added). Although no written consent to the procedure involved in this case is at issue, the above statute, in our view, is a plain statement of the requirements of the patient rule, absent the applicability of one or more of the exceptions to disclosure.

■ Our holding that the patient rule is applicable in both elective and nonelective medical procedures and thus applicable here, means that trial court's basis for directed verdict in favor of the defendant doctors, although understandable in light of our former case law, was erroneous.

II. The above determination does not end our inquiry, however, for defendants' motions also asserted there was insufficient competent evidence from which a jury could find they were guilty of negligence.

As the evidence developed from plaintiff's use of defendant doctors as witnesses, Becky's symptoms indicated a strong possibility of a serious and life-threatening infection, gram-negative sepsis. On the other hand, the risk of death posed by the IVP was 1 in 100,000 to 1 in 150,000.

■ We here confront not an action for battery, which may lie when a patient consents to one type of treatment and the physician intentionally deviates from the consent and performs a substantially different treatment. *See Moser v. Stallings,* 387 N.W.2d 599, 601–02 (Iowa 1986). Rather, we view these situations as sounding in negligence and imposing upon the doctor a duty reasonably to disclose information material to the patient's decision.

Thus framed, we must determine whether trial court's directed verdict ruling should be sustained on this alternative ground. We view the evidence, as trial court was obligated to do, in the light most favorable to plaintiff regardless of whether such evidence is contradicted and every legitimate inference which reasonably may be deduced therefrom must be carried to the aid of the evidence. *See DeBurkarte v. Louvar,* 393 N.W.2d 131, 133 (Iowa 1986); Iowa R.App.P. 14(f)(2). If reasonable minds then can differ on the subject, a jury question has been generated. *See Meeker v. City of Clinton,* 259 N.W.2d 822, 828 (Iowa 1977); *Harvey v. Palmer College of Chiropractic,* 363 N.W.2d 443, 444 (Iowa App.1984).

In this case there was little dispute about the operative facts. A patient with a potentially life-threatening illness was not told there was a 1 in 100,000 chance she could die from a diagnostic procedure. We must answer the question whether a jury reasonably could conclude this withheld information was material to Becky's decision. In *Cowman v. Hornaday,* 329 N.W.2d 422, 425 (Iowa 1983), we discussed the "subjective test" and the "objective test." *Id.* at 425.

The subjective test focuses on whether the particular patient would have considered the nondisclosed information sufficiently significant to affect his or her decision. *Id.* Although embraced occasionally by commentators, *see* M. Schultz, *From Informed Consent to Patient Choice: A New Protected Interest,* 95 Yale L.J. 219, 248–51 (1985), most courts have rejected the subjective test in favor of the objective test, *see id.* at 250 n. 126.

In *Cowman,* 329 N.W.2d at 425, we quoted the definition of materiality, in this context, that was adopted by the court in *Wilkinson v. Vesey,* 110 R.I. 606, 295 A.2d 676 (1972):

Materiality may be said to be the significance a reasonable person, in what the physician knows or should know is his [or her] patient's position, would attach to the disclosed risk or risks in deciding

whether to submit ... to surgery or treatment.

110 R.I. at 627, 295 A.2d at 689; *see also Canterbury v. Spence,* 464 F.2d 772, 787 (D.C.Cir.), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); *Cobbs v. Grant,* 8 Cal.3d 229, 245, 104 Cal.Rptr. 505, 515, 502 P.2d 1, 11–12 (1972); *Sard v. Hardy,* 281 Md. 432, 444, 379 A.2d 1014, 1022 (1977); *Festa v. Greenburg,* 354 Pa.Super. 346, 355, 511 A.2d 1371, 1375 (1986).

■ After careful consideration, we are unable to conclude, applying the above objective test for materiality, that a jury could reasonably find the withheld information relating to the extremely remote risk of death, shown by this record, would have been significant to a reasonable person in Becky's circumstances, or would have affected such a person's willingness to undergo the IVP. Plainly, the risk involved in every informed consent action is not so significant as to generate a jury question. It is generally acknowledged that not all risks need be disclosed, only the material risks. *Crain v. Allison,* 443 A.2d 558, 562 (D.C.App.1982); *Sard,* 281 Md. at 444, 379 A.2d at 1022. Cases involving the remoteness of the risk, falling on both sides of a necessarily obscure line,[2] are collected in *Canterbury,* 464 F.2d at 788 nn. 86–89, and *Smith v. Shannon,* 100 Wash.2d 26, 31, 36, 666 P.2d 351, 355, 357 (1983). *See also Hartke v. McKelway,* 707 F.2d 1544, 1548–49 (D.C.Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983). Plaintiff's proof in this case, although reflecting a most tragic situation, does not generate a jury question under the principles above noted. Trial court thus properly granted the defendant doctors' motions for directed verdict. *See Henderson v. Milobsky,* 595 F.2d 654, 659 (D.C.Cir.1978) ("[N]o prudent juror could reasonably have considered the [1 in 100,000] risk of permanent paresthesia material to a decision on whether to consent to the procedure....").

■ III. There remains the question whether trial court properly granted IMMC's motion for directed verdict. Without the citation of any authority directly supporting the proposition, plaintiff argues IMMC "had a duty either to disseminate the necessary information and secure the patient's response or to adopt policies and procedures which allow physicians practicing in the hospital to perform medical procedures *only* with the patient's informed consent." (Emphasis in original.) In the circumstances of this case, we hold no jury issue relating to IMMC's liability was generated.

In Iowa as elsewhere a hospital does not practice medicine. *See* Iowa Code §§ 135B.1(1), 148.1 (1981). This court has not imposed on a hospital a duty to inform a patient of matters that lie at the heart of the doctor-patient relationship. *See Sinkey v. Surgical Assocs,* 186 N.W.2d 658, 661 (Iowa 1971) ("We have found no cases which require a hospital to inform a patient of the radiologist's impressions. ... His reports are made to the doctor who is responsible to the patient."). In similar situations other jurisdictions have held the responsibility of obtaining informed consent is the duty of the doctor and the hospital should not intervene. *See Pickle v. Curns,* 106 Ill.App.3d 734, 739, 62 Ill.Dec. 79, 82–83, 435 N.E.2d 877, 880–81 (1982) ("We do not recognize the existence of a duty on the part of the hospital administration to insure that each of its staff physicians will always perform his duty of due care to his patient."); *Fiorentino v. Wenger,* 19 N.Y.2d 407, 415–16, 280 N.Y.S.2d 373, 379, 227 N.E.2d 296, 300–01 (1967); *Alexander v. Gonser,* 42 Wash.App. 234, 239, 711 P.2d 347, 351 (1985).

■ Nor, under the above state of the law, do we believe trial court erred in refusing to admit Exhibit 8, a manual published by the Joint Commission on the Accreditation of Hospitals, the accrediting

---

**2.** "There is no bright line separating the significant from the insignificant; the answer in any case must abide a rule of reason." *Canterbury,* 464 F.2d at 788.

agency for IMMC. That portion of the manual entitled "Rights and Responsibilities of Patients" contains a number of salutary principles and goals relating to the relationship of the patient both to the hospital and to the "practitioner." The patient rule may be traced through these principles, but, in the context of this case, the language neither adds to nor modifies our above holdings.

To the extent any of our prior decisions are inconsistent with our holding in division I of this opinion, the same are overruled. We affirm the judgment of the district court.

AFFIRMED.