# IN THE COURT OF APPEALS OF IOWA

No. 14-1682
Filed January 25, 2017

**ALAN ANDERSEN, Individually and as Injured Parent of CHELSEA ANDERSEN and BRODY ANDERSEN, and DIANE ANDERSEN, Wife of Alan Andersen,**
    Plaintiffs-Appellants,

**vs.**

**SOHIT KHANNA, M.D., and IOWA HEART CENTER, P.C.,**
    Defendants-Appellees.
_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg (partial summary judgment), Dennis J. Stovall (motion to reconsider), and Michael D. Huppert (pretrial motions and trial), Judges.

The plaintiffs in a medical malpractice suit appeal from a jury verdict in favor of the defendant; they also appeal from the court's rulings granting defendants' summary judgment on one claim of inadequate informed consent, limiting plaintiffs' second claim of inadequate informed consent, refusing plaintiffs' request for a rebuttal witness, and refusing proposed jury instructions. **AFFIRMED.**

Marc S. Harding of Harding Law Office, Des Moines, for appellants.

Nancy J. Penner, Jennifer E. Rinden, and Robert D. Houghton of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellees.

Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Alan Andersen was the patient in an unsuccessful Bentall heart procedure,[1] performed by defendant Dr. Sohit Khanna at Iowa Heart Center, P.C. The plaintiffs claimed several of the actions taken by Dr. Khanna fell below the standard of care and ultimately caused the failure of Andersen's left ventricle. The jury found that Dr. Khanna was not negligent.

On appeal, the plaintiffs maintain they should have been allowed to present two claims of inadequate informed consent, alleging (1) Dr. Khanna failed to advise Andersen that he had a "super bad heart" pre-surgery with an increased risk of mortality and (2) Dr. Khanna was required to inform Andersen he had never performed the procedure before. Dr. Khanna's failure to inform Andersen he had no experience in performing the surgical procedure had been pled and was the subject of the defendants' motion for partial summary judgment, which was granted by one pre-trial judge with a caveat that the plaintiffs could present evidence on Dr. Khanna's lack of experience—but could not argue it should have formed part of the informed consent information.

The plaintiffs then filed a "motion for reconsideration," which did not request reconsideration of the one issue already dismissed—Dr. Khanna's failure to include his lack of experience as an informed consent factor. Rather, the motion for reconsideration was based upon a discovery deposition of a defense expert, Dr. Henri Cuenoud, who had testified Andersen's heart condition pre-surgery was poor, increasing the risk the surgery would fail. The motion for

---

[1] The Bentall procedure is the replacement of the aortic valve, the aortic root, and the ascending aorta.

reconsideration requested the court allow the plaintiffs to argue that Anderson's pre-surgical condition should have been covered by Dr. Khanna as a risk factor in the informed consent conversation with Andersen. The court eventually ruled as part of its rulings on pre-trial matters that "Plaintiffs shall be allowed to present evidence relating to Dr. Cuenoud's awareness of the Plaintiff's increased mortality risk and apprising the Plaintiff of the same." Dr. Cuenoud's awareness of Andersen's pre-surgery condition was not the issue; Dr. Khanna's awareness of the pre-surgery condition and its effect on survivability was the issue—the court's ruling inserted the wrong doctor's name. But the parties tried the case to the jury without attempting to correct the order, with the plaintiff claiming Andersen's pre-surgical condition was good and only Dr. Khanna's negligence could have resulted in failure, while the defendants argued Andersen's pre-surgical condition was poor, resulting in an enhanced risk for the surgery, which then failed for that reason. Andersen did not present his alternate claim: that if Andersen's pre-surgical condition was poor, Dr. Khanna should have informed him of the increased risk as part of the informed consent conversation. Both parties proceeded as though both informed consent claims—Dr. Khanna's lack of experience and Andersen's enhanced risk—had been dismissed by the trial court. After the close of the plaintiffs' case and after Dr. Khanna's testimony in his own defense, the trial judge ruled that since the parties had tried the case based on the notion the issues of informed consent had been dismissed, he was not going to allow the issue to be raised at that point. Andersen raises both informed consent issues on appeal but was unable to say during oral argument

whether the issues had been pled or what ruling prevented the presentation of evidence.

Additionally, the plaintiffs argue the court abused its discretion when it refused to allow them to present a rebuttal witness, and they urge us to find the court erred when it refused to provide their proposed marshalling instruction to the jury.

## I. Background Facts and Proceedings.

Andersen was born in 1952 with a heart defect.[2] The defect and the resulting strain it caused on Andersen's heart ultimately caused his need for heart surgery.

In January 2004, Andersen met with a doctor at the Iowa Heart Center who then referred Andersen to a surgeon within the practice, Dr. Khanna. Dr. Khanna met with Andersen and his wife Diane, and Andersen was scheduled to have a non-emergency Bentall procedure on January 22, 2004.

Dr. Khanna performed the surgery, which required completely stopping Andersen's heart (through various measures including administering cardioplegia) and putting him on bypass. When the procedure was completed, Dr. Khanna was unable to get the left ventricle of Andersen's heart restarted. Dr. Khanna tried a number of techniques to restart the left ventricle, but none were successful. Dr. Khanna and another surgeon placed an assist device in Andersen's chest, which replaced the function of the left ventricle. Following the unsuccessful surgery, Andersen experienced a number of complications and he

---

[2] Andersen has a congenital bicuspid aortic valve; in other words, he was born with two flaps in his aortic valve rather than the typical three.

was in a coma for a period of time.  Andersen was transferred to the University of Iowa Hospital.

On February 26, 2004, when he was strong enough for another heart surgery, Andersen received a HeartMate—a less temporary device meant to assist the left side of his heart.  The HeartMate came with its own complications and challenges, and Andersen continued to have other health concerns.   He remained in the hospital in Iowa City until May 7, 2004.

Andersen lived with the HeartMate until he was able to receive a heart transplant on October 22, 2006.   Like the HeartMate, the transplant and the corresponding medications that were necessary led to other health issues—such as increased risk of cancer.

In September 2005, before Andersen received the heart transplant, the plaintiffs filed their first petition at law, claiming Dr. Khanna "was negligent in his treatment of Andersen by various acts and omissions."

The plaintiffs filed an amended petition in August 2008, alleging specifically that Dr. Khanna was negligent in the following ways:

> a. Failing to properly advise Andersen regarding the risks and dangers of the procedures recommended by Khanna, and failing to obtain informed consent for the procedures actually performed;
> b. Failing to properly assess, monitor, and care for Andersen before, during, and after the surgical procedure performed by Khanna on January 22, 2004;
> c. Failing to properly perform the surgical procedure undertaken by him on Andersen on January 22, 2004; and
> d. Failing to properly advise Andersen that he [Khanna] had limited experience in performing the Bentall procedure.

(Alteration in original.)

In May 2010,[3] the defendants filed a motion for partial summary judgment, maintaining the plaintiffs' fourth claim—that Dr. Khanna had failed to properly advise Andersen that he had limited experience performing the procedure—did not fall within the requirements of informed consent, and thus there was no legal basis for the claim. The defendants asserted they were "entitled to partial summary judgment in their favor on the informed consent claim to the extent it is based on the alleged failure to disclose Dr. Khanna's personal characteristics or experience in obtaining Andersen's informed consent."

A contested hearing was held on the matter, and on June 15, the district court granted the defendants motion.[4] In its ruling, the court stated:

> The Court agrees with the Defendant Khanna and the Iowa Heart Center that the informed consent for patients as defined under Iowa law requires a disclosure to the patient of all known material information concerning a particular procedure. The Court finds that Iowa law does not include a duty to disclose personal characteristics or experience of a physician or doctor in obtaining informed consent from a patient. Therefore, pursuant to Iowa law, the Court finds that the motion for summary judgment filed by Dr. Khanna and the Iowa Heart Center regarding informed consent is hereby sustained.
> The Court does observe, however, that this ruling does not prevent Plaintiffs from introducing evidence regarding the abilities, knowledge, experience and expertise of Dr. Khanna in performing the procedure at issue in this case. Clearly, these factors would be relevant to the issue of whether or not Dr. Khanna was negligent in performing medical procedures involved in this case.

The plaintiffs filed a "motion to reconsider," urging the court to allow a second informed consent claim based on the defense expert, Dr. Cuenoud, who testified in a deposition that Andersen's heart was in such bad shape prior to

---

[3] By this point, the trial had already been continued twice.
[4] In its ruling, the court also granted summary judgment for the defendants on the plaintiffs' claim against Iowa Heart Center, P.C. for allegedly negligently credentialing Dr. Khanna. There is no claim of error regarding that part of the court's ruling.

surgery that Andersen had a "significantly increased risk of complications during the surgery." Dr. Cuenoud also opined that Dr. Khanna was aware of the poor condition of Andersen's heart before surgery. The plaintiffs maintained that Dr. Khanna's failure to inform Andersen of the increased risks created a basis for this second informed-consent claim.

In September 2011, the district court ruled on the pending motion to reconsider. The court stated, "The Court reconsiders in June 15, 2010 ruling and enters the following ruling modifying the same only as follows: The Plaintiffs shall be allowed to present evidence relating to Dr. Cuenoud's awareness of the Plaintiff's increased mortality risk and apprising the Plaintiff of the same."[5]

The trial was scheduled to begin on October 31, 2011. It ended in a mistrial after a plaintiffs' attorney represented during jury selection that Dr. Khanna had lied.

The trial was then rescheduled to begin in April 2013. In March 2013, leading up to trial, the defendants filed a third motion in limine, in which they raised some new limine issues but also expressed their understanding about the current state of the court's previous rulings. In doing so, the defendants expressed, "Plaintiff's informed consent claim that had been dismissed on summary judgment was *not* reinstated by the [September 2011] reconsideration of that dismissal." The court filed an order in response to the motion, stating in pertinent part: "The prior rulings of the court . . . are reaffirmed and shall stand as the rulings of this court once trial commences."

---

[5] The parties now seem to agree that the insertion of Dr. Cuenoud's name in the ruling on reconsideration was a scrivener's error and should have been Dr. Khanna. However, the confusion from this mistake endured throughout most of the trial.

The second trial also ended in a mistrial due to the same plaintiffs' attorney violating the court's ruling in limine that the jury not be allowed to consider Andersen's medical expenses in determining the extent of his injuries. The plaintiffs' attorney in question had his pro hac vice admission revoked, and the plaintiffs engaged new representation.

The trial was then rescheduled for July 2014. Whether the plaintiffs had an informed-consent claim was raised again in a pre-trial hearing on July 2. The defendants made clear to the court that they understood there was no informed-consent claim based on the alleged failure to advise Andersen he was at increased risk during the surgery due to his "bad heart." The plaintiffs countered that they believed there was a viable claim because of Dr. Cuenoud's deposition testimony. The defendants responded, "Your Honor, that is our expert, not an expert to be called in plaintiffs' case-in-chief. Plaintiff's didn't cross-designate or in any way indicate a reliance on our expert opinions, so we believe informed consent is out of the case." The defendants did not argue they had never moved for summary judgment on the issue of the "super bad heart" and it was not the subject of the summary judgment ruling. The plaintiffs did not argue their theory of the case that Andersen did not have a "super bad heart" and should have survived the surgery. The court responded:

> Well, here is where I'm still confused, more so from a lack of sustained involvement in this case. There was an informed consent claim that was the subject of a summary judgment motion which was granted. Now, ordinarily that would tell me everything I need to know about the viability of the informed consent claim. Has there been any effort to re-plead another informed consent claim since [the ruling granting partial summary judgment]?

The plaintiffs' attorney responded, "Not to my knowledge."

During voir dire examination on July 7, 2014, outside the presence of the potential jurors, the court and the attorneys again discussed the prior rulings on the claim for informed consent. The court stated, in part:

> [Plaintiffs' attorney] had requested some guidance regarding where he could or could not go in jury selection, and that transformed into a general discussion about the issue of Dr. Khanna's qualifications or lack thereof to perform the procedure that brings us all together today.
> . . . .
> But it would appear to me that this issue has been addressed in one of the previous rulings from my predecessors. It looks like it was Judge Stovall in his ruling September 20th, 2011, where he addressed the defendants' second motion in limine. And I'm just going to read . . . . 'Dr. Khanna's qualifications may be pursued by the plaintiffs in the context of a general negligence claim, along with the issue of informed consent, consistent with the Court's ruling on this issue in the plaintiff's motion to reconsider.'

Once trial started, the plaintiffs called a number of expert witnesses; more than one expert testified Andersen was a "good candidate" for the surgery, and another expert testified he "would expect a good result" for Andersen having the procedure. None of the plaintiffs' witnesses testified that Andersen was more at risk to have an unsuccessful outcome in the surgery due to other issues with his heart. In fact, the plaintiffs' theory was that because Andersen had such a high likelihood of success, it must have been the negligent action (or inaction) of Dr. Khanna that caused the failure of the left ventricle. Andersen's testimony presented in the plaintiffs' case did not include questioning on the issue of informed consent.

On the eighth day of the trial, after plaintiffs had rested but before the testimony of defense expert Dr. Cuenoud, plaintiffs asked the court for guidance

regarding the scope of the testimony they could elicit from the doctor. The plaintiffs argued,

> Remember, we talked about the issue of informed consent being out of the case, with the one exception that the Court reconsiders it June 15th, 2010 ruling and says that the plaintiff shall be allowed to present evidence relating to Dr. Cuenoud's awareness of the plaintiff's increased mortality risk and apprising the plaintiff of the same, which apprising the plaintiff of the same, of course, is informed consent.
>
> So by them bringing him in here to testify, I believe that that's fair game irrespective of whether they raise the issue or not, but I certainly don't want to go there if you don't want me to.

After a brief recess and more discussion on the topic, the court ruled:

> All right. The parties and the Court have taken this case up to this point we're now in the waning days of trial, after a week and a half of trial, operating under the assumption that informed consent was out of the case. I know that there have been some issues back and forth on this topic, but in general, either in terms of offers of proof or other proffers of evidence, nothing has been presented that would suggest that informed consent was going to be a theory of liability for the jury to resolve or at least to preserve for further review. I'm not going to reopen that issue mid-trial to allow for a discussion of whether or not Dr. Khanna should be found liable or negligent for not discussing any increased risks from the surgery that the doctor may be testifying about today.
>
> So I'm not going to reconsider the prior rulings on informed consent, while acknowledging that it is possible that [the September 2011 ruling on the motion to reconsider] may have inserted the wrong doctor's name in [the] ruling regarding whose awareness of the increased mortality risk in apprising Mr. Andersen of the same may have been intended. I don't know if that reference to the doctor's awareness relates to Dr. Khanna or not. I don't see any way to reasonably read that sentence without concluding that perhaps Dr. Cuenoud was inadvertently inserted when Dr. Khanna may have been intended.
>
> But that being said, the parties under the Court's direction have kept this case from being developed as an informed consent case, and that's not going to change mid-trial, with the plaintiffs having rested.

Dr. Cuenoud testified that, in his opinion, Dr. Khanna had done nothing wrong in either performing the Bentall procedure or in the steps he took afterward

to try to restart Andersen's left ventricle. Rather, Dr. Cuenoud opined the reasons Andersen's left ventricle had failed was due to "extreme exhaustion" of the heart. When asked why Andersen's heart was extremely exhausted Dr. Cuenoud explained:

> Because Mr. Andersen was like a marathon runner or arriving at the end of the marathon. You cannot run another marathon. So his heart had been submitted to an abnormal valve for years. He has been very stable and suddenly in December of 2003 the heart started to give up, so his heart—when he went to surgery, his heart was not a normal heart, was a heart that was tired. So when you add the stunning[6] on top of it, some patients can't tolerate that.

The defendants also called another expert witness, Dr. Love, who testified that Andersen's ongoing issues with his heart leading up to the surgery likely caused the failure. The doctor testified.

> And all this is to say that particular situation in this patient would lend to the possibility that you're going to have a real great difficulty protecting the heart adequately or not—simply not be able to protect it adequately because of the 50 years of the physiology and the anatomic abnormalities that I just described.

Later, the doctor opined, "I think this heart was stunned from global inability to protect it. That's the way it behaved afterwards."

Near the conclusion of the defendants' presentation of evidence, the plaintiffs indicated to the court they intended to call a rebuttal witness to respond to the defendants' experts who "have beaten the drum about plaintiff's heart being such that it would be difficult for him to recover." The plaintiffs indicated they believed they "should be entitled to challenge the defense of the so-called

---

[6] In another part of his testimony, Dr. Cuenoud described "stunning": "When the heart re-emerges from that cold period of an hour or two, it's weak. It's weak for many minutes, sometimes an hour, and then it recovers its strength. So the cold effect is stressful to the heart, so it's called post cardioplegia stunning."

worn-out heart." The defendants resisted, arguing that their experts had testified pursuant to their designations, so there was nothing new or unexpected that the plaintiffs needed to rebut.

In making its ruling, the court noted that in the plaintiffs' case-in-chief, they had an expert who testified regarding his opinion about the condition of the heart before the surgery. The court also found that the defense experts had testified in accordance with their prior designations, so "[i]f it was a surprise, it wasn't because of a lack of prior disclosure." The court denied plaintiffs' request to present rebuttal witnesses.

After the defense rested, the court and the parties discussed what instructions should be given to the jury. The plaintiffs asked the court to instruct the jury that Dr. Khanna's lack of experience in performing the Bentall procedure was a separate specification of negligence. The court had proposed a marshalling instruction as follows:

> The plaintiffs must prove all of the following propositions:
> 1. Sohit Khanna, M.D. was negligent in one or more of the following ways:
> a. In providing inadequate myocardial protection to Alan Andersen's heart during the Bentall procedure; or
> b. In improperly reattaching Alan Andersen's left main coronary artery during the Bentall procedure; or
> c. In taking too much time to perform the left main coronary artery bypass in response to the failure of Alan Andersen's left ventricle following the Bentall procedure.
> 2. The negligence was a cause of damage to the plaintiffs.
> 3. The amount of damage.
> If the plaintiffs have failed to prove any of these propositions, the plaintiffs are not entitled to damages from the defendants. If the plaintiffs have proved all of these propositions, the plaintiffs are entitled to damages from the defendants in some amount.

The plaintiffs asked the court to add another subsection under (1), stating, "In performing the Bentall procedure on Alan Andersen without being properly trained or without the experience to do so." The court refused the plaintiffs' request. Plaintiffs also requested jury instructions on the issues of inadequate informed consent, which were denied by the court.

Following deliberation, the jury returned a verdict finding that Dr. Khanna was not negligent. The jury did not reach the causation question.

The plaintiffs filed a motion for new trial, alleging several errors they believed entitled them to a new trial. The defendants resisted, and a hearing was held. The court denied the plaintiffs motion in its entirety.

The plaintiffs appeal.

## II. Standards of Review.

We review summary judgment rulings for correction of errors at law. *Roll v. Newhall*, ___ N.W.2d ___, ___, 2016 WL 7421325, at *2 (Iowa 2016). We examine the record before the district court to determine whether any material fact is in dispute, and if not, whether the district court correctly applied the law. *Id.*

We generally review evidentiary rulings for abuse of discretion. *Williams v. Hedican*, 561 N.W.2d 817, 822 (Iowa 1997).

We review the district court's decision disallowing the plaintiffs' use of a rebuttal witness for an abuse of discretion. *See Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996) ("The trial court's ruling will be disturbed only upon a clear abuse of discretion.").

"Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *Alcala v. Marriott Inter., Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). "The verb 'require' is mandatory and leaves no room for trial court discretion." *Id.* Thus, absent a discretionary component, "we review refusals to give a requested jury instruction for correction of errors at law." *Id.*

## III. Discussion.

### A. Informed Consent.

Plaintiffs argue they were wrongly prevented from having the jury decide two informed-consent claims. They maintain Dr. Khanna was negligent for failing to inform Andersen (1) he had a "super bad heart," which substantially increased his risk of the procedure being unsuccessful and (2) Dr. Khanna had never performed the procedure before.

"[T[he doctrine of informed consent arises out of the unquestioned principle that absent extenuating circumstances a patient has the right to exercise control over his or her body by making an informed decision concerning whether to submit to a particular medical procedure." *Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355, 358 (Iowa 1987). "Thus, a doctor recommending a particular procedure generally has, among other obligations, the duty to disclose to the patient all material risks involved in the procedure." *Id.* Under the "patient rule," "the physician's duty to disclose is measured by the patient's need to have access to all information material to making a truly informed and intelligent decision concerning the proposed medical procedure."

*Id.* at 359. The rule applies in all informed consent cases, in both elective and nonelective procedures. *Id.*

To be successful in a claim for failure to obtain informed consent, the patient must establish:

> (1) The existence of a material risk unknown to the patient;
> (2) A failure to disclose that risk on the part of the physician;
> (3) Disclosure of the risk would have led a reasonable patient in plaintiff's position to reject the medical procedure or choose a different course of treatment; and
> (4) Injury.

*Id.* at 360. "Further, the patient ordinarily will be required to present expert testimony relating to the nature of the risk and the likelihood of its occurrence, in order for the jury to determine, from the standpoint of a reasonable patient, whether the risk is a material one." *Id.*

### 1. "Super Bad Heart."

A lot of confusion has been generated by the way the informed consent claims have been argued—as if there was only one such claim.[7]

The defendants moved for the summary dismissal of one of those claims—the one based upon Dr. Khanna's failure to tell Andersen about his inexperience. The court, in its ruling, appeared to consider only the one claim challenged by the defendants, stating:

> The Court finds that Iowa law does not include a duty to disclose personal characteristics or experience of a physician or doctor in obtaining informed consent from a patient. Therefore, pursuant to Iowa law, the Court finds that the motion for summary judgment

---

[7] Part of the dispute involving the various rulings and their evolution at trial involve the fact that three different judges presided over important components of the case with later judges interpreting and then adopting those earlier rulings as their own. The parties acted on their own misinterpretation of the plain language of the rulings resulting in an assumption the claims of inadequate informed consent were dismissed.

filed by Dr. Khanna and the Iowa Heart Center regarding informed consent is hereby sustained.

However, the plaintiffs apparently understood the court's ruling to mean that both claims had been dismissed, as they filed their motion to reconsider asking the court to reinstate the "super bad heart" claim based on the fact that Dr. Khanna had failed to inform Andersen that he was at an increased risk because of the history of his heart.

In ruling on the motion to reconsider, the court wrote, "The Court reconsiders its June 15, 2010 ruling and enters the following ruling modifying the same only as follows: The Plaintiffs shall be allowed to present evidence relating to Dr. Cuenoud's awareness of the Plaintiff's increased mortality risk and apprising the Plaintiff of the same."  While it is clear to us that the only reasonable reading of the reconsideration ruling is that Andersen's claim of inadequate informed consent could be explored at trial relating to *Dr. Khanna's* understanding of any increased mortality risk and whether *Dr. Khanna* informed Andersen of the increased risk, the plaintiffs did not seek to clarify the order nor to introduce evidence of Dr. Khanna's opinion of the pre-surgical condition of Andersen's heart.  In other words, the plaintiffs did not, either during the presentation of their evidence or in their cross-examination of Dr. Khanna, raise the issue regarding what Andersen had been told by Dr. Khanna or what he should have been told by Dr. Khanna regarding the condition of his heart pre-surgery.

Then, before Dr. Cuenoud's testimony, the parties and the court had the following discussion outside the presence of the jury. The plaintiffs' attorney stated:

> Just the one other issue here, Judge, so that we don't get off into the area of violating a motion in limine. Remember, we talked about the issue of informed consent being out of the case, with the one exception that the Court reconsiders its June 15th, 2010 ruling relating Dr. Cuenoud's awareness of the plaintiff's increased mortality risk and apprising the plaintiff of the same, which apprising the plaintiff of the same, of course, is informed consent.
> So by their bringing him in here to testify, I believe that that's fair game irrespective of whether they raise the issue or not, but I certainly don't want to go there if you don't want me to.

The court heard from both parties and took a recess to "digest" the information before ultimately ruling that the plaintiffs would not be allowed to ask even Dr. Cuenoud about his awareness of the Andersen's increased mortality risk and apprising Andersen of the same. In making its ruling, the court stated:

> [T]he parties under the Court's direction have kept this case from being developed as an informed consent case, and that's not going to change mid-trial, with the plaintiffs having rested. And so we'll have to wait to see how that shakes out down the road, but for the remainder of the trial, informed consent is still out.

Still, after they had rested, the plaintiffs made an offer of proof in which Andersen testified if he had been told he had a twenty-five percent chance of dying during the surgery, he would have "thought a lot more about having the surgery," thought about getting a second opinion, and "would have made sure that [his cardiologist] was involved in that decision." In another offer of proof, Andersen testified that if he had been told he had a "super bad heart" before surgery, he would not have allowed Dr. Khanna to schedule the surgery without consulting other doctors and he "would have wanted to know what made my chances for

survival so much worse than everybody else's." Andersen also made it clear that Dr. Khanna did not inform him that he "had a super bad heart for an elective surgery that was more difficult than the traditional Bentall elective surgery."

The jury never heard or decided the issue, and the plaintiffs maintain this is in error.

However, the reason the jury never heard the issue was because both parties wrongly proceeded under the theory that the "super bad heart" claim had been dismissed when the court dismissed the claim regarding Dr. Khanna's duty to inform Andersen about his lack of experience. The ruling on the motion for partial summary judgment was silent toward and did not dismiss the "super bad heart" claim, and, if anything, the ruling on the motion to reconsider reinstated or at least allowed that claim. That being said, though the claim survived summary judgment, the plaintiffs failed to pursue it at trial. They did not cross-designate defense expert Dr. Cuenoud or question their own experts about material risk and a doctor's duty to inform, they never re-pled their claim or asked the court for clarification of when or how this informed-consent claim ceased to exist, and they never made an offer of proof regarding what Andersen knew or had been told about the condition of his heart pre-surgery during their case-in-chief. Because the source of the confusion appears to come from nothing more than the parties' own misinterpretation of the plain language of rulings early in the case, there is no relief that we can offer. We find no abuse of discretion in the court's refusal to expand the issues at trial after the close of the plaintiffs' case.

**2. Experience of Doctor.**

The defendants maintained, and the trial court found, the doctor's obligation to obtain informed consent does not create a duty that the doctor inform the patient about the doctor's lack of surgical experience. The plaintiffs maintain the district court's ruling granting summary judgment and dismissing the claim was in error.

The defendants maintain doctors are only required to inform patients about possible risks and issues with the procedure itself, while the plaintiffs assert that doctors also have a duty to inform the patient of physician-specific information that a reasonable patient would want to know in order to make a "truly informed and intelligent decision."

In support of their position, the plaintiffs urge us to consider cases where other states have found that a doctor's failure to inform the patient of his or her lack of experience was sufficient to create a jury question about whether it was a failure to obtain informed consent. *See Goldberg v. Boone*, 912 A.2d 698, 702, 716–17 (Md. 2006) (noting the court had previously recognized "that the level of a physician's experience may form the basis for an informed consent action" and holding a jury question had been generated where the patient alleged that his more-complex-than-usual surgery combined with the doctor's lack of experience, gave rise to a duty that the doctor inform the patient there were more experienced surgeons in the region who could perform the surgery); *see also Johnson by Adler v. Kokemoor*, 545 N.W.2d 495, 505 (Wis. 1996) ("We conclude that the circuit court did not erroneously exercise its discretion in admitting evidence regarding the defendant's lack of experience and the difficulty of the

proposed procedure. A reasonable person in the plaintiff's position would have considered such information material in making an intelligent and informed decision about the surgery.").

Neither party has identified, and we have not found, an opinion where an Iowa court has explicitly considered whether the doctor's inexperience is a material risk or factor that falls within the duty to disclose.

That being said, we are persuaded the defendants and the trial court's reading of the informed-consent requirement is the current state of the law. Iowa Code section 147.137 (2007) provides, "A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of this section shall create a presumption that informed consent was given." The statute continues, stating that "[a] consent in writing meets the requirements" if it:

> Sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures, with the probability of each such risk if reasonably determinable.

Iowa Code § 147.137(1). The statute is silent as to any physician-specific information that must be disclosed to meet the informed-consent requirements.

We agree with the district court that the plaintiffs' claim for failure to obtain informed consent based on Dr. Khanna's lack of inexperience is not a basis for recovery; Dr. Khanna did not have a duty to inform Andersen of his experience, or lack thereof, in performing the procedure. Summary dismissal of this informed-consent claim was appropriate as a matter of law. *See Overturff v.*

*Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241, 245 (Iowa 2008) ("Because the existence of a duty under a given set of facts is a question of law for the court, it is properly resolvable by summary judgment.").

**B. Rebuttal Witness.**

Plaintiffs claim the district court abused its discretion when it prevented them from calling a rebuttal witness to in order to respond to the defense expert witnesses' testimony regarding the condition of Andersen's heart before surgery. The plaintiffs claimed they needed to call the rebuttal witness to explain "no, this isn't true what Cuenoud said, and why."

Rebuttal evidence "explains, repels, controverts, or disproves evidence produced by the other side." *State v. Webb*, 309 N.W.2d 404, 411 (Iowa 1981). However, "[r]ebuttal is not intended to give a party an opportunity to tell his [or her] story twice or to present evidence that was proper in the case in chief." *Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996) (second alteration in original) (citation omitted). "Thus, rebuttal should not be used as corroboration, reiteration, or repetition of the plaintiff's case in chief," and "evidence which is merely cumulative, . . . which merely bolsters or supplements that already adduced by the plaintiff, is not admissible as rebuttal." *Id.* (citation omitted).

Insofar as the plaintiffs claim they should have been allowed to present rebuttal testimony to rebut the defense experts' testimony that Andersen had a "super bad heart," which increased his chances of having an unsuccessful procedure, we cannot say the district court abused its discretion in disallowing them to do so. The plaintiffs were aware the defense experts were going to testify as such. In fact, they relied on Dr. Cuenoud's deposition testimony in

which he compared Andersen's heart to that of a marathon runner at the end of a race as the basis for their 2011 motion to reconsider. The plaintiffs were alerted to the fact that such testimony was likely to occur, and they provided testimony to the contrary from their own experts during the plaintiffs' case-in-chief. Rebuttal evidence is not meant to let the plaintiffs have the last word on a disputed issue.

Next, plaintiffs claim they needed to present rebuttal testimony to show that they were never informed of Andersen's "super bad heart." There was nothing preventing the plaintiffs' attorney from eliciting testimony from Andersen and his wife Diane regarding the fact that they had never been told Andersen had an increased risk of his left ventricle failing. Even before the district court made it clear that it believed the ruling on the motion to reconsider applied to what Dr. Khanna knew about Andersen's heart before surgery and what information had been imparted to Andersen, the court reiterated several times that plaintiffs were "allowed to present evidence relating to Dr. Cuenoud's awareness of the Plaintiff's increased mortality risk and apprising the Plaintiff of the same." We cannot say the district court abused its discretion in preventing the plaintiffs from calling a rebuttal witness to elicit evidence that could have been presented in the case-in-chief.

Finally, the plaintiffs maintain that not being allowed to present the rebuttal evidence "gives the impression that Mr. Andersen knew all of the risks and simply chose to take those risks with his super bad heart." It is unclear to us what claim of error the plaintiffs are making here; to the extent we understand their argument to be one regarding causation of the harm experienced by

plaintiffs, we note that the jury never got to the question of causation because it found Dr. Khanna had not been negligent.

We find no abuse of discretion in the district court's decision to deny the plaintiffs' request to call an expert rebuttal witness.

**C. Jury Instructions.**

The plaintiffs maintain the district court erred when it denied their request to amend a jury instruction to include an additional, separate specification of negligence.  Namely, the plaintiffs wanted the instruction to read, in part:

The plaintiffs must prove all of the following propositions:

> 1. Sohit Khanna, M.D. was negligent in one or more of the following ways:
>> a. In performing the Bentall procedure on Alan Andersen without being properly trained or without the experience to do so.

The plaintiffs objected to the instruction without the added specification, and, after the court denied their request to amend the instruction, they raised the alleged claim of error in their motion for new trial.

A court must give a requested instruction when it states a correct rule of law applicable to the facts of the case that is not embodied in other instructions. *See Mulhern v. Catholic Health Initiatives*, 799 N.W.2d 104, 123 (Iowa 2011). However, here we are persuaded by the district court's reasoning regarding why the proposed addition is not a correct statement of the law.  The court compared the plaintiffs' assertion that Dr. Khanna's lack of experience alone was an act of negligence with the proposition that a drunk driver is negligent simply for being drunk.  As our supreme court has stated:

> [I]ntoxication in and of itself is not, as defendant seems to contend, conclusive evidence of . . . negligence. . . .
>
> . . . . Before a drunk driver can be held liable for injuries to another or barred from recovering for his own injuries, his intoxicated condition must be translated into outward conduct which is negligent and bears a causal relationship to the injury.
>
> Evidence of an intoxicated condition is properly admissible as one of the circumstances surrounding conduct showing a lack of due care under the circumstances.

*Yost v. Miner*, 163 N.W.2d 557, 561 (Iowa 1968) (citations omitted).  The district court concluded:

> Just as an intoxicated driver is not negligent merely by virtue of that intoxication absent "outward conduct which is negligent," so too an inexperienced physician is not negligent simply as a result of that inexperience; that lack of training or experience must translate into a deviation of the standard of care in performing the procedure in question.

We agree with the district court's rationale.  Additionally, we note the plaintiffs were allowed to (and did) introduce evidence regarding Dr. Khanna's lack of experience in performing the procedure, and the jury was able to consider such evidence in determining whether the doctor had performed the procedure in a negligent manner.

We find no error in the district court's refusal to amend the marshalling instruction given to the jury.

**IV. Conclusion.**

Because we find no error on the district court's part that prevented the jury from hearing that Andersen was never told about his "super bad heart," there is no relief that we can grant.  Because Dr. Khanna had no duty to inform Andersen of his inexperience in performing the procedure, summary judgment of that informed consent claim was proper.  Additionally, the court did not abuse its

discretion in refusing to allow the plaintiffs to call a rebuttal witness, and the court did not err in refusing to provide the plaintiffs' proposed marshalling instruction to the jury. We affirm.

**AFFIRMED.**