# IN THE COURT OF APPEALS OF IOWA

No. 20-0697
Filed November 23, 2021

**ZAW ZAW**
Plaintiff-Appellee,

**vs.**

**KEVIN BIRUSINGH, M.D., and THE IOWA CLINIC, P.C.,**
Defendants-Appellants.

_____

**KEVIN BIRUSINGH, M.D., and THE IOWA CLINIC, P.C.,**
Third-Party Plaintiffs-Appellants,

**vs.**

**LANGUAGETECH, INC.,**
Third-Party Defendant-Appellee

_____

Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.

The defendant doctor and employer clinic appeal from the judgment entered against them in a medical negligence case. **REVERSED AND REMANDED FOR NEW TRIAL.**

Stacie M. Codr and Jeffrey R. Kappelman of The Finley Law Firm, P.C., Des Moines, for appellants.

Marc S. Harding of Harding Law Office, Des Moines, and Ben Novotny and Matthew Reilly of Trial Lawyers for Justice, Decorah, for appellee Zaw Zaw.

Michael J. Moreland of Harrison, Moreland, Webber, & Simplot, P.C., Ottumwa, for appellee LANGUAGEtech, Inc.

Heard by Tabor, P.J., and Greer and Badding, JJ.

**GREER, Judge.**

Plaintiff Zaw Zaw was born in Burma, and his first language is Burmese. Zaw, his wife, and their three children moved to Iowa in May 2015. About six months later, Zaw was referred by his primary care physician to The Iowa Clinic, P.C. for a circumcision. At The Iowa Clinic, Zaw met with Dr. Kevin Birusingh. An interpreter hired by the clinic through LANGUAGEtech, Inc. attended the initial appointment and provided interpretation services for Zaw and the doctor. The same occurred at the second appointment, at which Dr. Birusingh performed a vasectomy—not a circumcision—on Zaw. Zaw brought suit, alleging Dr. Birusingh was medically negligent and The Iowa Clinic, as Dr. Birusingh's employer, was vicariously liable for the doctor's actions.[1] Dr. Birusingh and The Iowa Clinic later moved to bring suit against LANGUAGEtech, alleging that if Dr. Birusingh was found to be negligent, then they would have a cause of action against the interpreters.

Following a multi-day jury trial, the jury was instructed to consider whether Dr. Birusingh was negligent in his communication with Zaw or in failing to obtain informed consent from Zaw. In a general verdict, the jury concluded both that Dr. Birusingh was negligent and caused damage to Zaw and that Zaw was negligent or failed to mitigate his damages. It assigned 70% of the fault to Dr. Birusingh, 30% of the fault to Zaw, and no fault to LANGUAGEtech. The jury awarded Zaw $500,000 for past loss of bodily function; $250,000 for future loss of bodily function;

---

[1] At trial, The Iowa Clinic stipulated it was vicariously liable if Dr. Birusingh was found to be negligent.

$1,000,000 for past physical and mental pain and suffering; and $250,000 for future physical and mental pain and suffering.

Dr. Birusingh and The Iowa Clinic appeal, alleging a number of errors. Generally, they assert the court should have granted their motion for judgment notwithstanding verdict (JNOV) or, in the alternative, their motion for new trial.

## I. Background Facts and Prior Proceedings.

On December 22, 2015, Zaw met with his primary care physician, Dr. Noreen O'Shea, at Des Moines University (DMU). Dr. O'Shea does not speak Burmese, and no interpreter was present for this appointment. At this appointment, Zaw communicated to Dr. O'Shea that he was having trouble when he urinated. Dr. O'Shea examined Zaw's penis and determined he was having difficulty retracting the foreskin. She also noted that he had a small bead—about the size of a BB—under the skin located "one-third to one-half the way up the . . . dorsal shaft of the penis."[2] Because of the issue with his foreskin, Dr. O'Shea believed Zaw would benefit from circumcision. She created a referral order for Zaw, referring him to a urologist at The Iowa Clinic for an appointment the next day. Before Zaw left her office, she provided him a physical copy of the referral order. While she did not personally fax it, Dr. O'Shea assumed a copy of the order was also faxed to The Iowa Clinic as part of her office's standard practice.

The next day, Zaw went to The Iowa Clinic. An interpreter, Noel Siama, met Zaw at the clinic. Both men then met with Dr. Birusingh. The doctor's notes from the appointment include that Zaw and his wife have three children, "[t]hey

---

[2] Zaw testified he chose to have the bead—called a "golly" in Burma—placed there when he was younger.

have expressed a desire to have no more children," and Zaw was seen for a vasectomy consult. Dr. Birusingh examined Zaw's genitalia; he made no note of either the bead under the skin of Zaw's penis or phimosis.[3]

Sometime at the first appointment, Zaw and Siama were given a "consent for sterilization" form, which included language about how it was the patient's decision to be sterilized, "the sterilization must be considered permanent and not reversible," the patient was agreeing he did "not want to become pregnant, bear children or father children," and the patient was choosing sterilization rather than temporary methods of birth control. The form mentioned "bilateral vasectomy" at least twice. It also included an "interpreter's statement," which stated:

> I have translated the information and advice presented orally to the person to be sterilized by the person obtaining this consent. I have also read him/her the consent form in Burmese [handwritten] language and explained its contents to him/her. To the best of my knowledge and belief he/she understood this explanation.

Both Zaw and Siama signed the form on December 23. Zaw was given a "No-Scalpel Vasectomy" brochure to take with him when he left. He testified he showed his wife the brochure but then threw it away so his daughter would not see it— presumably due to the anatomical drawings of the male reproductive system.

A few days later, on December 29, Dr. Birusingh faxed a letter to Dr. O'Shea thanking her for sending Zaw to him, providing his notes from the December 23 visit (including that Zaw was seen for a vasectomy consult), and giving his cell phone number if Dr. O'Shea wished to reach him. The letter did not mention

---

[3] "Phimosis" is "tightness or constriction of the orifice of the foreskin arising either congenitally or postnatally (as from balanoposthitis) and preventing retraction of the foreskin over the glans." *Phimosis*, Merriam-Webster, https://www.merriam-webster.com/medical/phimosis (last visited Oct. 19, 2021).

circumcision. Dr. O'Shea confirmed she received and reviewed Dr. Birusingh's letter within a few days of it being faxed. She did not follow up with Dr. Birusingh. At trial, she testified that when she received the letter, she believed she may have misunderstood Zaw during her appointment with him since they were interacting without an interpreter.

Around the same time frame, Dr. Birusingh and The Iowa Clinic sent a letter, written in English, to Zaw that listed Zaw's "chief complaint" as being seen per request of Dr. O'Shea "for urological consultation regarding vasectomy consult." Zaw testified he received this letter.

On January 25, 2016, Zaw attended a medical appointment for constipation with Physician Assistant Dan Chambers. P.A. Chambers's notes from the appointment state Zaw mentioned "an implanted plastic ball near the end of his penis along the shaft he would like us to remove today. It is not causing any difficulty with function but wants it removed as he will be undergoing a vasectomy in about 10 days in West Des Moines." The "discussion" part of the medical form references an interpreter being used at the appointment but, during his testimony, Chambers did not remember one being present—even after being shown a note suggesting one was used for the appointment.

Also on January 25, an employee of The Iowa Clinic called LANGUAGEtech about Zaw's upcoming appointment. According to LANGUAGEtech's notes, the clinic informed them an interpreter was needed for Zaw's January 29 vasectomy appointment with Dr. Birusingh. The vice president and part-owner of

LANGUAGEtech, Forrest Corson,[4] testified that he was the person who took the call from The Iowa Clinic and made the note in their system about it. He also testified he sent a text message to Jeremiah Puia, one of the interpreters who worked with the company and speaks Burmese, to ask him to attend the appointment. Corson believed he told Puia in the text message that the appointment for Zaw was vasectomy related.

Zaw's second appointment with Dr. Birusingh took place on January 29, 2016, and Puia provided interpretation services. At this appointment, Dr. Birusingh performed a vasectomy on Zaw. Zaw was awake throughout the procedure, and a local anesthetic was applied only to Zaw's scrotum. Zaw's penis retained sensation and was covered by a sheet (i.e. was outside the surgical area). At some point during this appointment—possibly after the procedure was already completed—Zaw signed a "consent for vasectomy" form. This second consent form did not have a space for the interpreter to sign.

Zaw met with Dr. O'Shea on February 2, 2016—just a few days after the vasectomy. According to Dr. O'Shea's trial testimony, Zaw "was upset about having a procedure he didn't ask for and not having the procedure he did ask for." At this appointment, Dr. O'Shea informed Zaw that reversal of the vasectomy is possible with another outpatient surgery. Testimony at trial established that reversals have about a 90% success rate of sperm being found in semen samples.[5]

---

[4] Corson testified he owns 49% of the company while his wife owns 51%.

[5] The testimony established that while the return of sperm occurs in about 90% of vasectomy reversals, the rate of pregnancy after a vasectomy reversal is "20 to 25

In July 2016, Zaw underwent surgery to get a circumcision and have the bead removed from his penis. This surgery required him to go under general anesthesia, as a vasectomy reversal would require. Zaw could have had a vasectomy reversal done that same day; he chose not to.

Zaw brought this lawsuit in November 2017.[6] A few months later, Dr. Birusingh and The Iowa Clinic moved to file a third-party petition against LANGUAGEtech. The district court granted the request, and the case eventually proceeded to a jury trial in November 2019.

Before trial, Dr. Birusingh and The Iowa Clinic moved to exclude the testimony of Zaw's expert, Dr. Stephen Busky, arguing Dr. Busky failed to provide an opinion as to what constituted the standard of care. Dr. Birusingh and The Iowa Clinic argued Dr. Busky's opinion that the standard of care was only outcome

---

percent lower than the 90 percent return of sperm." This reduced rate was explained as follows:

> We're doing a vasectomy reversal usually to achieve pregnancy; sometimes, like I mentioned, because there's chronic pain. But once you reflow—once you establish flow of sperm, you're kind of back to the baseline; but just like in real life, you don't always get pregnant just because you're trying to have a child.
>
> There are lots of things that come into play, life-style, habits, age, you know, multiple things, both partners; and so the pregnancy rates are lower than the 90 percent return of sperm.
>
> . . . .
>
> The sperm are not any different because someone's had a vasectomy. You just merely restore the—the tract, the vas deferens, the tube.

[6] Zaw's wife, Zin Lang Aung, was originally also a plaintiff in the suit. Her claims were dismissed before the case went to the jury, leaving only Zaw as a plaintiff. Zaw also alleged negligence against other medical providers involved in his care, but those claims were dismissed before trial.

based was improper as an attempt to impose strict liability against Dr. Birusingh.[7] The court later denied this motion.

Additionally, leading up to the start of trial, the court was asked to decide the number of juror strikes each party would be allotted. Zaw maintained he should receive four strikes to use while Dr. Birusingh (and The Iowa Clinic) would get two and LANGUAGEtech would get two. Dr. Birusingh and The Iowa Clinic advocated that they should receive four strikes and LANGUAGEtech should also get four strikes. LANGUAGEtech agreed it should get its own four strikes. The court noted Iowa Rule of Civil Procedure 1.915(7) provided, "Each side must strike four jurors. Where there are two or more parties represented by different counsel, the court in its discretion may authorize and fix an additional number of jurors to be impaneled and strikes to be exercised." The court ultimately allowed Zaw to have four strikes

---

[7] In the discovery deposition, Dr. Busky summarized his opinions during this exchange:

Q: In terms of wrapping this up, insofar as your—any criticism that you intend to offer of Dr. Birusingh at trial in this matter, I'm going to go back to Iowa and my client Dr. Birusingh is going ask me a very fair question. And that question is going be what did Dr. Busky say I should have done—how did I deviate from the standard of care. And when he asks me that question what I'm going to take away from this deposition, unless you tell me otherwise, is he said that you deviated from the standard of care because Mr. Zaw contends that he underwent a surgery when he intended a different surgery. A. That's fair.

Q. And when you say he didn't effectively communicate what he was going to do, that's based on the fact— A. Yeah.

Q. —that's based on the outcome? A. That's based on the outcome.

Q. Okay. That's not based on anything Dr. Birusingh said or testified under oath that he did that you take issue with or that he didn't do that you take issue with? A. I think I have to say it's based on the outcome.

and Dr. Birusingh (and The Iowa Clinic) and LANGUAGEtech were given three each.

Much of the trial involved conflicting testimony about Zaw's two appointments with Dr. Birusingh. According to Siama, the interpreter from Zaw's first appointment who signed the "consent for sterilization" form, he did not "say all the single word[s on the consent form], but [he] explain[ed] all the procedures and all the meaning" to Zaw. Siama did not have an independent memory of Zaw's appointment, and he testified he did not know what the words "vasectomy" or "sterile" meant at the time of that appointment. However, he also testified that when he did not know how to translate a word, he used a dictionary or phone apps or asked the medical professionals to clarify. And he testified that while "vasectomy" would not have been a term he could translate to Burmese because there is no equivalent term, he would have been able to translate "no more babies," "no more children," and "permanent birth control" without the use of any aids. Siama testified he would only sign the interpreter's statement after he explained the rest of the document to Zaw. As for the vasectomy brochure, Siama confirmed if the brochure was provided to Zaw, he would have translated the content during the appointment. Records from the first visit show Siama billed for being at Zaw's appointment—measured from the time he met Zaw in the waiting area until the time he and Zaw left—for one hour and ten minutes.

The interpreter from the second appointment, Puia, testified that at Zaw's direction, he wrote on the intake form that Zaw was there for "cutting the skin"— meaning Zaw wanted the extra skin on his penis cut. Then they gave that form to the nurse who took them back to the room; Puia did not see the nurse read the

form.  Puia testified the appointment "was fast" and "we didn't talk too much."  He denied that the nurse or Dr. Birusingh ever talked about the procedure that was about to take place.  According to Puia, Zaw was confused and sad after the surgery and neither the nurse nor Dr. Birusingh discussed "permanent birth control" or withdrawing consent beforehand.  Puia agreed he interpreted what Dr. Birusingh said while he was performing the procedure but only remembered Dr. Birusingh saying Zaw was "going to get injection or something like that.  That's all."  When shown the "consent for vasectomy" form that Zaw signed at the second appointment, Puia testified he had never seen the document before.  But he testified that if Zaw was given the document in his presence, he would have explained the content to Zaw; he denied he would tell someone the document was not important rather than interpreting it to them.  Puia submitted a bill for one hour and fifteen minutes for Zaw's January 29 appointment.

According to Zaw, who testified through an interpreter, Dr. O'Shea gave him a physical copy of the referral form she created when he left her office.  He took it with him to his first appointment at The Iowa Clinic on December 23 and gave it to the interpreter.  The interpreter then handed the form to a person at the check-in area.  The form was given back to Zaw at some point during that first visit.[8]  Zaw agreed it was his signature on the "consent for sterilization" form.  When asked if he met with Dr. Birusingh before he signed it, Zaw responded,

> So, I go in the clinic, and the interpreter show me on the form, and he explain it to me, and I sign it on the paper.  I sign it on the form. He asking me, You came to the clinic for what?  And then I told him the reason I came to the clinic.

_____

[8] Zaw testified the referral order was handed back to him and, at trial, he brought in his copy, which was admitted into evidence.

Zaw clarified that he told the interpreter, "I have a trouble when urinate, so I want to cut out my skin." Zaw was with only the interpreter—not Dr. Birusingh or Nurse Lais Heideman—when he made this statement. Then the following exchange occurred during examination of Zaw:

> Q. [D]id Dr. Birusingh explain to you on—on December 23rd that you were consenting to a sterilization? A. Yeah. He speak English. We talk to interpreter.
> Q. Did the interpreter explain to you that this was a consent to sterilization? A. He did not explain it to me, and then he said, Yes, yes.
> Q. Okay. You said he said, Yes, yes. Why did you sign it? A. Yeah. I came to the clinic, and then he—the interpreter asking me, What you reason you come, and I have to do—because I have a problem like that, and he said, You have to sign on the paper. So I sign on the paper.
> Q. When he said you had to sign on the paper, did he explain to you what the paper said? A. No, he didn't explain it to me. Only she get a notes from me.
> Q. So when you signed it, did you have any idea that it said that it was a consent to sterilization? A. I don't know.
> Q. Did your interpreter at that point say anything about the surgery coming up? A. No.

Zaw testified he signed the consent for sterilization "outside the clinic when [he] came in with interpreter, [he] signed on the paper with interpreter." He clarified it was just the two of them present when he signed it. Zaw also testified that he was given the brochure for the no-scalpel vasectomy but the interpreter did not interpret it for him; the interpreter told Zaw that more information about the surgery would be given to him later. Zaw testified that he did not sign the consent for vasectomy until after the procedure was completed. He said he was told by the second interpreter that they forgot to give him the letter to sign, it was not important, and he should sign it, so he did. But later in his testimony, when Zaw was asked whether he remembered if he signed the consent for vasectomy before or after the

procedure, he testified he did not remember and subsequently followed up with a statement that he signed it "before the surgery or after the surgery." According to Zaw, there were no medical professionals around when he signed the consent to sterilization or the consent for vasectomy. Additionally, the following exchange occurred on direct examination:

> Q. Before the vasectomy was done, did Dr. Birusingh explain to you that he was going to be performing a vasectomy? A. Uhmmm, the day I have a surgery, no explaining to me.
> Q. Was there any—so there was no explanation by Dr. Birusingh the day of the surgery? A. 2015, talk with the interpreter, but I don't know about it.
> Q. Okay. In 2016, before the surgery, did Dr. Birusingh talk with you about what the surgery was going to be? A. No. Either one, interpreter didn't explain it to me.
> Q. Okay. And what about the nurse? Did the nurse explain it to you before the surgery? A. No.

On cross-examination, Zaw was asked about his deposition testimony when he was asked, "So do you think the doctor was saying something that was not interpreted to you by the interpreter?" and Zaw responded, "Yes, I think that." When asked what made him think that, Zaw said, "Seems like the interpreter don't want to interpret everything to me."

Dr. Birusingh testified he is not part of the scheduling process for his patients—"what [he] see[s] is the patient's name on [his] list for the day, and their—their main complaint or their main issue." Dr. Birusingh testified he had never seen the referral form from Dr. O'Shea before the lawsuit and that after reviewing the records at The Iowa Clinic, "neither [the referral form] or any other records from DMU are in the The Iowa Clinic records." However, when asked to review the notes from Zaw's first appointment, Dr. Birusingh testified the nurse who worked with him, Nurse Heideman, would have input the information under the "chief

complaint" section. That note said, "ZAW ZAW, a 37 year old male is seen per request of NOREEN OSHEA DO for urological consultation regarding vasectomy consult." He also testified that it would not matter what was on the referral form; when he meets with a patient, it is up to him and the patient to determine what the course of treatment is going to be.

According to Dr. Birusingh, Nurse Heideman brings patients back into the exam room and, at that time, brings the no-scalpel vasectomy brochure with her. She would go over the brochure with the patient and then leave it in the room with them until Dr. Birusingh was able to come in. Once he introduces himself to the patient, he confirms why they are there. "Always the first thing [he] ask[s] is, Okay. Well, I've got to ask this right out of the bat: Are you 100 percent sure that you don't want to have any more children?" After he receives verbal confirmation, he asks whether the patient is married and if their spouse is sure they do not want to have any more children. Once he starts to discuss the vasectomy procedure, he uses the diagram in the brochure to explain the anatomy involved and how the procedure is done. Dr. Birusingh explains that the scrotum will be cleaned and shaved, and then he will give two injections of pain medicine—one on the right side and one of the left side of the scrotum. He then explains that he will puncture the scrotum and then isolate the vas deferens, cut a piece out of the middle of it, and cauterize both edges. He also explains that the patient needs "to do absolutely nothing" and not lift anything heavier than ten pounds for forty-eight to seventy-two hours after the procedure. And then he tells the patient that they are not considered sterile until he confirms there is no sperm in the sample they bring in three months after the procedure, so alternative birth control is necessary. Dr.

Birusingh testified he "always ask[s] patients, you know, you have seen this consent form to sterilization? We've talked a lot about that particular procedure, and you understand that sterilization means it's a permanent form of birth control, and that's why we're doing this vasectomy?"

Testifying more specifically about his meetings with Zaw, Dr. Birusingh testified that when he did a physical exam of Zaw at the first appointment, he did not find phimosis. He testified that he explains what he is doing and feeling as he touches the patient, and, in the case of Zaw, he "would always say something and would hear something back. If I don't hear anything back after I say something, I'll look at the interpreter to see if there is something I missed." Based on the interpreter speaking after he did and the lack of consternation or concern he saw on the interpreter's or Zaw's face, Dr. Birusingh believed everything he was saying was being interpreted to Zaw.

Dr. Birusingh testified that Nurse Heideman brings the "consent for sterilization" form back to the exam room at the same time she brings the patient and the no-scalpel brochure. "So, [Nurse Heideman] will go through [the consent for sterilization] with the interpreter prior to [Dr. Birusingh] entering the room, and the patient will sign once there's confirmation from [the nurse] and the interpreter that he understands." When asked if he went over the consent form with Zaw, Dr. Birusingh testified:

> So for my role in confirming that this consent—you know, that the patient understands what's in the consent is at the end of my physical exam, like we talked about in our conversation, I'll reference this document and say, You know, you have signed or haven't signed a consent for sterilization. You know, we've talked about everything that's involved in terms of the vasectomy, and the vasectomy is a procedure that makes it so you can't have any more kids and that

you're sterilized. Do you understand everything in that document? Do you have any questions about that document?

So I always reference this and confirm that they have no questions and are understanding.

Dr. Birusingh testified he never signs the "consent for sterilization" form "until [he's] had conversation with the patient and confirmation that they understand all of our previous discussion prior." He also testified as to the importance of the "interpreter's statement" on the consent form and said he would not sign if the interpreter had not already done so.

In regard to Zaw's second appointment with him, Dr. Birusingh testified Nurse Heideman brings the patient back to the exam room and then "goes over a set of post-procedural instructions and very specific details about what we want to do after the procedure"—including giving the patient a specimen cup to bring in a semen sample three months later for testing. She also discusses the upcoming procedures and checks if the patient has questions. During this time—before Dr. Birusingh comes in the room—Nurse Heideman goes over the "consent for vasectomy" form with the patient and interpreter. Once Nurse Heideman informs him the patient is ready, Dr. Birusingh goes into the exam room, asks again if they are "still 100 percent sure" they do not want to have any more children, and "run[s] through the procedure again with the patient." At this appointment, Zaw asked Dr. Birusingh if he could remove the bead from his foreskin. Dr. Birusingh looked at it and told Zaw he could not remove it that day. Then Zaw laid down, and Dr. Birusingh began the vasectomy. During this time, Zaw's penis retained sensation and was laying on his abdomen, covered by a sheet and towel. Dr. Birusingh did not have any contact with Zaw's penis, and only Zaw's scrotum was in the surgical

field. It took about fifteen to twenty minutes for Dr. Birusingh to perform the vasectomy on Zaw, who was awake throughout that time. Once the procedure was done, Dr. Birusingh provided some reminders about post-procedure care, including bringing the sample in for testing, and then left. Zaw did not express any concern or ask questions before Dr. Birusingh left the room.

Nurse Heideman worked primarily with Dr. Birusingh when she worked for The Iowa Clinic, and she was the nurse working with him for both of Zaw's appointments. She testified she would have taken the intake form from Zaw and the interpreter and then verified the information with the patient. If the intake form said anything inconsistent with a vasectomy, she would have clarified with the patient, notified the doctor, and put that information on the electronic medical record. She testified nothing on Zaw's intake form alerted her he was there for a circumcision. Once she takes the vitals of the patient and goes over their form with them, she would then confirm with the patient they were there for a vasectomy and go over the no-scalpel vasectomy brochure with them. She does not go over it word-for-word but confirms that a vasectomy is a permanent form of birth control, which means they will not be able to have more children. She also talks to them about preparation for the procedure and then needing to bring in a sample three months later to confirm they are sterile. Nurse Heideman believed the interpreter was interpreting her statements to Zaw, and Zaw did not ask any questions at the first appointment. Then, before leaving the room, Nurse Heideman gives the patient the "consent for sterilization" form; double checks the physician, procedure, patient name, and date of birth; and tells the patient to read over it, ask any questions if they have them, and then sign. She testified she makes sure the

patient signs in front of her to ensure they are the one signing the consent. She also testified she observed the interpreter going over the consent form with Zaw before witnessing Zaw sign it. Then Nurse Heideman would leave the room, taking the signed consent with her, to let the doctor know the patient was ready and to enter the information on the intake form into the computer system.

As for Zaw's second appointment, Nurse Heideman was again the person who met him to take him back to the exam room and who took his form from him. She testified the form did not include any information stating he was there for "cutting the skin." Once he was back in the room, she would have confirmed again that he wanted to have a vasectomy, which is a permanent form of birth control and meant he would have no more children. Then she gave Zaw the specimen cup and explained the importance of returning to have the doctor confirm his semen no longer contained sperm. She reviewed other post-vasectomy instructions and specifically recalled speaking with Zaw because he asked how to collect the specimen to bring in for testing and followed up with more questions about how he should do that. After that, she reviewed the "consent for vasectomy" form with Zaw, and then he signed it while she was in the room. Nurse Heideman then left the room until after the procedure was completed, returning to check Zaw's vitals and make sure he was okay to leave. When she saw him after the procedure, Zaw did not express concern or bring to her attention that he had the wrong procedure. According to Nurse Heideman, it is not unusual for a patient coming for a vasectomy to come without a referral or outside medical records because "patients often call to just make a vasectomy appointment for themselves, so it's not necessarily, you know, a referral from the doctor that we're looking for

in the chart." There are other diagnoses that usually come with a doctor referral, "but even then, you know, oftentimes when a patient comes in and we kind of do a full assessment with them, that initial diagnosis that they were sent there for may not be, you know, the concern of the visit."

Dr. Busky, a urologist from Maryland, testified as the plaintiff's expert. His testimony was presented by way of a video deposition. In his testimony, Dr. Busky was critical of Dr. Birusingh's physical examination of Zaw, noting he "totally miss[ed] two, two issues that . . . Zaw Zaw had apparently mentioned and one very prominent one, the bead." Dr. Busky testified "that a patient know[ing] what surgery is actually being done" is "the standard of care" and giving a patient the no-scalpel brochure only meets the standard of care "if it was intelligible to the patient." Dr. Busky denied ever using a brochure to explain a vasectomy in his forty years of practice and said because of the elective nature of vasectomies, he "would spend much more time talking about the implication of a vasectomy than he would" other non-elective surgeries. But he also agreed he "[did] not hold the opinion that Dr. Birusingh in any way deviated from the standard of care by using the no-scalpel vasectomy handout." He testified that when speaking with the patient,

> I would emphasize again and again and again not the complications of vasectomy but the implications of a vasectomy, no more children. And frankly, I wouldn't have any problem explaining that to a Burmese [person] because there must be one word for babies. . . .
> I would ask a translator what is the word for baby. It would be very simple to say no more babies.

He also testified the doctor has the ultimate responsibility to make sure the patient has the information, stating that after he completes one side of the vasectomy, he

asks the patient if they are sure they want him to complete the other side. Dr. Busky opined that when treating a patient who does not speak English, it is prudent and appropriate for the doctor to make visual observations of the patient's body language, gestures, and facial expressions to determine whether they are understanding. He agreed that saying, "Are you 100 percent sure that you don't want to have more children?" and telling Zaw he "would not be able to have any more children" are appropriate statements for a doctor to make to a patient before performing a vasectomy. Dr. Busky also agreed it is appropriate and prudent for a doctor to utilize a document like the "consent for sterilization" form "in working towards the desired level of communication about a vasectomy procedure" and in relying on the "interpreter's statement" as part of that document as well. Additionally, when asked, Dr. Busky agreed he "did not observe anything in the medical records or materials . . . to indicate . . . that Dr. Birusingh was provided any signal that Mr. Zaw did not understand what was being communicated to him by the interpreter." He also agreed that the second consent form—the "consent for vasectomy" form—is appropriate and commonly used to obtain written consent for a vasectomy. While Zaw signed two consent forms, "[o]ne is sufficient" according to Dr. Busky. Dr. Busky generally agreed that if Dr. Birusingh did exactly as he claimed to have done with Zaw, then Dr. Birusingh did not deviate from the standard of care. If Dr. Birusingh repeatedly told Zaw "no more children" when meeting with him before performing the procedure, "that's good practice." According to Dr. Busky:

> You have to communicate to the patient what's happening, what's going to happen to them or what the implications of your work is.
> . . . .

You have to take into account what the patient's abilities are to understand what you're saying and what he can comprehend and deal with when you give information.

Over Dr. Birusingh's objection, Dr. Busky was allowed to testify that "the standard [of care] is making sure that the patient really understands."

Dr. Bradley Thorgaard, a urologist who practices in Ames, was hired as an expert witness by Dr. Birusingh and The Iowa Clinic. Dr. Thorgaard testified it is "routine" for him to see patients who come to his practice without a consult referral sheet or anything from another doctor. Dr. Thorgaard testified about the vasectomy procedure; the patient may feel a pinch or some discomfort during the procedure, that feeling is "in the scrotum or the testicle," and "[t]hey will not feel penile pain." The doctor performing the vasectomy does not make any contact with the penis, and the penis does not lose sensation so "[i]f you did anything to penis when you were trying to do a vasectomy, you would know it immediately with patient discomfort." Dr. Thorgaard also testified about the "consent for sterilization" form that Zaw signed at the first appointment; either Dr. Birusingh or Nurse Heideman would "have to be in the room" to get the consent because "[t]he interpreter couldn't be reading it to the patient. You would have—you would have someone in—communicating with the interpreter to the patient." Dr. Thorgaard clarified that it would not be necessary for the doctor or nurse to watch the patient physically sign the document "but for the actual reading of all those medical words a doctor . . . or a nurse must be there." This is "very important" because "if the interpreter doesn't understand something, they need a resource—a doctor, a nurse—to say, I don't understand this word, what does that mean." In his

deposition, Dr. Birusingh was asked if "anything on the consent for sterilization [was] read to Mr. Zaw in [his] presence" and he said, "No."

Zaw's wife, Zin Lang Aung, testified that she was on birth control at the time Dr. Birusingh performed the vasectomy because they were new to the United States and still settling into their new community. They planned to have at least one more child, and both still wished to do so. She testified Zaw was "sad" after he realized he had been sterilized and "sometime[s]" continued to be sad as of the time of trial. On cross-examination, Zin Lang Aung testified she was thirty-six at the time of Zaw's vasectomy and had been on birth control since the birth of their youngest child, so for a few years. Additionally, although Zaw was told about the possibility of a vasectomy reversal in February 2016, at her deposition in October 2018, Zin Lang Aung was asked if Zaw told her "there's a procedure where they could undo it so [she] could have a baby," and she responded, "No." With a second question, she confirmed Zaw had not talked to her about a reversal.

Over Dr. Birusingh and The Iowa Clinic's objection, the court gave the jury a marshalling instruction that told it to consider whether Dr. Birusingh was negligent "in his communication with Plaintiff Zaw Zaw;" or "[i]n failing to obtain informed consent from Plaintiff Zaw Zaw." Dr. Birusingh and The Iowa Clinic argued that the multiple "particulars" of negligent action (or inaction) Zaw claimed all fell under whether Dr. Birusingh obtained informed consent. In contrast, Zaw argued for two separate negligence claims, stating:

> This is what we talked about a little bit on Friday afternoon, and that is negligence—right?—is whether you find, like, the standard of care and he had an affirmative duty to do so, such as communication. And you procure documents that, you know, whether or not he violated his own duty.

Informed consent is separate and apart from that, and now we've got to flip the lens, and that is what Mr. Zaw and/or the reasonable person in like or similar circumstances has in this dialogue, this conversation.

So first you have to have the negligence claim in that what information did Dr. Birusingh have or fail to have. Right? I mean, did he shred documents or was he supposed to have documents; you know, communication we've talked about with the primary care doctor, that communication—that's all incumbent through the standard of care language.

Once we're in the room and we have Dr. Birusingh, Mr. Zaw, and the interpreter, that's where we have the informed consent claim. So I think they're separate and apart. I think it's very crystallized in this case of the two differences in between the two claims, Your Honor.

Dr. Birusingh and The Iowa Clinic responded:

I think what we just heard, [Zaw's counsel] said, once in the room, those communications are part of the informed consent process. The communications he's talking about are with Dr. O'Shea, or this referral form, what information he had, did he shred something.

There's absolutely no expert testimony supporting any of that, and the Proposed Instruction Specification of Negligence No. 1 under a separate negligence from informed consent is talking about communications with Mr. Zaw which Mr. Novotny just said when he's in the room, that's the informed consent piece. The other, effectively, communication is with everything else.

And—and, again, when you're talking about what the physicians—the ways they communicate with the patient in the room, that's all part of the informed consent process because it is a negligence standard and what a reasonable physician would do to disclose that information.

This—this piece is subsumed by the informed consent elements and would—I mean, I guess, try to end run around the specific elements that are part of that process.

As stated, the court instructed the jury separately on negligent communication and informed consent, stating, "I think given the evidence as it's come in in this case and as it's been pled, that they are conceptually different claims. I explained this off the record, but essentially there are facts relating to the

alleged failure to ascertain why Mr. Zaw was at the doctor that are separate, in my mind, from informed consent."

Additionally while discussing jury instructions, Dr. Birusingh and The Iowa Clinic argued The Iowa Clinic should not be included or referenced in any instructions and the defense would just stipulate that any judgment against Dr. Birusingh applied jointly and severally against The Iowa Clinic as well. Zaw resisted, and the court ruled it would include The Iowa Clinic in the jury instructions because it was a defendant (and a third-party plaintiff). Then, during the jury's deliberation, it sent out a question asking, "Are Dr. Birusingh and Iowa Clinic joint or can a [percentage] be assigned to each?" After discussion with counsel for the parties over email, the court responded to the jury:

> There is no direct claim for negligence or fault against The Iowa Clinic. Therefore, you cannot assign a percentage of fault to The Iowa Clinic.
> You are only to consider Dr. Birusingh's conduct, not the conduct of The Iowa Clinic or any other actor, in assessing if he was negligent or assigning fault, if any, to Dr. Birusingh.

In a general verdict, the jury concluded "Yes" Dr. Birusingh was negligent and that he caused "an item of damage to" Zaw. LANGUAGEtech was not found to be negligent, but the jury found Zaw was "negligent and/or . . . he fail[ed] to mitigate his damages." It assigned Dr. Birusingh 70% of the fault and Zaw 30%. Before the reduction for his percentage of fault, the jury awarded Zaw $500,000 for past loss of bodily function; $250,000 for future loss of bodily function; $1,000,000 for past physical and mental pain and suffering; and $250,000 for future physical and mental pain and suffering.

In a post-trial motion, Dr. Birusingh and The Iowa Clinic moved for JNOV for a number of reasons, including that Zaw's informed-consent claim was not supported by substantial evidence or expert testimony—specifically on the element that Dr. Birusingh failed to disclose material information concerning the vasectomy; Zaw failed to overcome the statutory presumption of informed consent to which Dr. Birusingh was entitled under Iowa Code section 147.137 (2017); the jury should not have been instructed on a negligent-communication claim as any such claim was subsumed by the informed-consent claim; and even if the negligent-communication claim was a separate claim than informed consent, it was not supported by substantial evidence because there was no expert testimony establishing a standard of care—both because Dr. Busky did not provide such an opinion and because his testimony should not have been admitted at trial.

Dr. Birusingh and The Iowa Clinic also moved for new trial or remittur, claiming they should receive a new trial for all the grounds stated in the motion for JNOV; the jury's verdict finding Dr. Birusingh negligent and LANGUAGEtech not negligent was inconsistent because then the jury must have found the interpreter informed Zaw of the information in the consent form he signed, which would mean Zaw knew he was having a vasectomy; if LANGUAGEtech interpreters were not negligent, then Zaw's fault exceeded that of Dr. Birusingh as a matter of law; substantial evidence did not support the jury's verdict; the jury's award of damages was excessive, so new trial or remitter should be granted; Dr. Busky's testimony should have been excluded; the jury was wrongly instructed on two negligence claims when neither were supported by substantial evidence; The Iowa Clinic should have been removed from the jury instructions out of concern Dr. Birusingh

would be found negligent for something other than his own conduct, which was borne out when the jury sent a question to the court during deliberations about assigning the clinic its own fault; and the court wrongly gave Dr. Birusingh and The Iowa Clinic three juror strikes while giving Zaw four. Dr. Birusingh and The Iowa Clinic also broadly claimed that the verdict as a whole failed to effectuate substantial justice.

Zaw and LANGUAGEtech resisted the motions.

After a hearing on the motions—for which we do not have the transcript[9]—the court denied Dr. Birusingh and The Iowa Clinic's motions in their entirety.

Dr. Birusingh and The Iowa Clinic appeal.

## II. Discussion.

### A. Negligent-Communication Claim.

We start with the issue that guides our decision to require a new trial. Zaw's negligent-communication claim should not have gone to the jury, as there was neither expert testimony nor substantial evidence to support it. As such, the district court was wrong to instruct the jury it could find Dr. Birusingh liable for medical negligence under the theory of "negligent communication." And we find the court erred in its ruling denying Dr. Birusingh and The Iowa Clinic's motion for JNOV on this theory of negligence. However, because the informed-consent issue remains viable, a new trial is required to address that theory.

Dr. Birusingh and The Iowa Clinic maintain the district court erred in denying their motion for JNOV on this issue. "We review rulings on JNOV motions for

---

[9] The hearing was reported, but the appellants did not order the transcript in their combined certificate. *See* Iowa R. App. P. 6.803(1).

correction of errors at law." *Ferguson v. Exide Techs., Inc.*, 936 N.W.2d 429, 431 (Iowa 2019). "Our role is to decide whether there was sufficient evidence to justify submitting the [claim] to the jury when viewing the evidence in the light most favorable to the nonmoving party." *Smith v. Iowa State Univ. of Sci. & Tech.*, 851 N.W.2d 1, 18 (Iowa 2014) (citation omitted). In other words, "[i]n reviewing rulings on a motion for [JNOV], we simply ask whether a fact question was generated." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). "To justify submitting the case to the jury, substantial evidence must support each element of the plaintiff's claim." *Smith*, 851 N.W.2d at 18. And "evidence is substantial if 'reasonable minds would accept the evidence as adequate to reach the same findings.'" *Id.* (citation omitted).

First, we summarize how Zaw characterized his "negligent communication" claim. As Zaw explained what he meant by "negligent communication" as distinct from informed consent, the claim of negligent communication involved Dr. Birusingh's duty to obtain information about Zaw and the procedure he wanted from third-party sources—like Dr. O'Shea and the referral form. When requesting that the jury be instructed on two separate negligence claims, Zaw explained:

> [N]egligence—right?—is whether you find, like, the standard of care and he had an affirmative duty to do so, such as communication. And you procure documents that, you know, whether or not he violated his own duty.
> Informed consent is separate and apart from that, and now we've got to flip the lens, and that is what Mr. Zaw and/or the reasonable person in like or similar circumstances has in this dialog, this conversation.
> So first you have to have the negligence claim in that what information did Dr. Birusingh have or fail to have. Right? I mean, did he shred documents or was he supposed to have documents; you know, communication we've talked about with the primary care

doctor, that communication—that's all incumbent through the standard of care language.

Once we're in the room and we have Dr. Birusingh, Mr. Zaw, and the interpreter, that's where we have the informed consent claim. So I think they're separate and apart. I think it's very crystallized in this case of the two differences in between the two claims, Your Honor.

Zaw doubled down on this explanation of "negligent communication" later, when he argued Dr. Birusingh "could be negligent in informing the patient based on his own actions, what he did, what he failed to do with communication with the [primary care physician], with his own staff, with shredding documents." He continued, "[B]ut in that room, it's the informed consent part of the equation, and the negligen[t communication] is outside the room. So you could find he was negligent in not getting all the information he needed here. That's negligence. That's on the doctor."

To prevail on this theory, Zaw's prima facie case of medical negligence required him "to establish the applicable standard of care, a violation of that standard, and a causal relationship between the violation and the injury." *Susie v. Fam. Health Care of Siouxland, P.L.C.*, 942 N.W.2d 333, 337 (Iowa 2020). But no expert testified as to the standard of care for a urologist in obtaining information from outside care providers before performing a vasectomy.[10] *See Kennis v. Mercy Hosp. Med. Ctr.*, 491 N.W.2d 161, 165 (Iowa 1992) (finding expert testimony

---

[10] Dr. Birusingh and The Iowa Clinic responded to Zaw's argument for the separate negligent-communication claim in kind, stating:

I think what we just heard [plaintiff's counsel] say, Once in the room, those communications are part of the informed consent process. The communications he's talking about are with Dr. O'Shea, or this referral form, what information he had, did he shred something. There's absolutely no expert testimony supporting any of that . . . .

was necessary to establish the duty of a physician to consult a previous medical record of the patient because a layperson untrained in medicine could not know the amount of investigation required by a physician prior to undertaking a surgery). Certainly, the focus of Dr. Busky's opinions did not address the duties defined by Zaw in his negligent-communication claim. Instead, the expert evidence only supported a finding of no negligence. Both Dr. Birusingh and Dr. Thorgaard testified urologists commonly perform vasectomies without referral forms because patients can schedule the procedure without first receiving a referral from another doctor. And no expert testified as to what steps a prudent doctor would take in talking to or meeting with his or her staff or coworkers before meeting with a patient or performing a procedure. Likewise, no one testified it was outside the standard of care of a urologist, through his or her clinic, to shred documents provided from the patient or another clinic.

Plus, the evidence Zaw pointed to in support of his negligent-communication claim could not support a finding Dr. Birusingh breached his duty. Zaw pointed out that the intake form he claims the interpreter wrote on saying Zaw wanted his skin cut was shredded, that the copy of the faxed referral order from DMU never made it into Zaw's file at The Iowa Clinic, and the worker at the front desk did nothing with the referral form Zaw and the interpreter handed to them. But these are all outside of the actions and control of Dr. Birusingh. As the jury was instructed, there was no direct claim of negligence or fault against The Iowa Clinic—only Dr. Birusingh's conduct was to be considered when determining whether he acted negligently.

Based on this, the court should not have instructed the jury that there were two separate ways to find Dr. Birusingh liable for medical negligence.

Separately, we find the court erred in how it instructed the jury regarding the second negligence claim. All theories developed by Zaw regarding "negligent communication" centered on Dr. Birusingh's communication with third parties, such as Dr. O'Shea or other staff at The Iowa Clinic. And in granting Zaw's request to instruct on the two separate claims, the court stated it was instructing on both "given the evidence as it's come in in this case . . . . [E]ssentially, there are facts relating to the alleged failure to ascertain why Mr. Zaw was at the doctor that are separate, in my mind, from informed consent." But the instruction itself told the jury it could find Dr. Birusingh liable for medical negligence if Zaw proved Dr. Birusingh was negligent "[i]n his communication with Plaintiff Zaw Zaw."

In ruling on Dr. Birusingh and The Iowa Clinic's motion for JNOV, the court applied the same understanding of the negligent-communication claim. The district court found the jury could properly conclude Dr. Birusingh violated the standard of care because "[a]ll of the experts . . . testified that a doctor has a duty to communicate effectively with their patient." As we have already laid out, this was never Zaw's theory of "negligent communication." And if it was, it should have been subsumed within the duty to obtain informed consent, as the components of informed consent involve the doctor's duty to reasonably communicate the type of procedure to the patient. In its ruling, the court also referenced Dr. Busky's repeated statements that "making sure the patient understands" and ensuring the "patient knows what surgery is actually being done" constitute the standard of care. But Dr. Busky made those statements in reference to what was required to obtain

informed consent. That he wrongly described a strict liability standard for informed consent does not make his statements applicable to a separate theory of what it takes to communicate non-negligently.[11] *See Canterbury v. Spence*, 464 F.2d 772, 780 n.15 (D.C. Cir. 1972) ("[O]ne of the difficulties with analysis in terms of 'informed consent' is its tendency to imply that what is decisive is the degree of the patient's comprehension."). The district court also cited Dr. Birusingh's own testimony, when he stated, "I think we both know that you can't really make anybody understand anything, but it's my job to communicate the procedure, how it's going to be performed, the risks and the benefits, the possible complications." But again, this would go to an informed-consent claim and whether the doctor failed to disclose material information concerning the procedure. *See Andersen v. Khanna*, 913 N.W.2d 526, 541 (Iowa 2018) ("A claim for informed consent does not depend on if the physician *performed* the procedure negligently; rather, it turns on whether the physician failed to obtain consent by failing to disclose material information."). Finally, the court concluded that the jury could have found "Dr. Birusingh failed to communicate with Zaw in a way that would determine why he had sought medical care. This theory is akin to a failure to diagnose." But this is not the claim Zaw asked for; Zaw advocated that "negligent communication" is what happens "outside the room" with third parties, while the necessary discussions for proper treatment are "in the room" with the patient and fall under the informed-consent umbrella.

---

[11] At oral argument, under these facts, Zaw conceded a standard that requires a doctor to "make sure the patient understands" and "knows what surgery is actually being done" elevated the standard to strict liability.

Because Zaw's theory of negligent communication was not supported by expert testimony or substantial evidence, the claim should not have made it to the jury. And because the jury returned a general verdict finding Dr. Birusingh liable for medical negligence, we cannot say whether they found liability on the improper claim.[12] Additionally, the court erred in crafting a theory of negligent communication that was wholly separate from the one Zaw requested and then compounded the mistake by applying that same theory in ruling on Dr. Birusingh and The Iowa Clinic's motion for JNOV. For all of these reasons, a new trial is necessary. *See Erickson v. Wright Welding Supply, Inc.*, 485 N.W.2d 82, 86 (Iowa 1992) ("In civil cases, 'when a trial court errs in submitting even one of several theories of recovery and the jury returns only a general verdict for the plaintiff the verdict cannot stand and the defendant is entitled to a new trial.'" (citation omitted)).

**B. At the Next Trial.**

**1. Improper Expert Testimony and the Informed-Consent Theory.**

Because we are granting a new trial, it follows that the informed-consent theory of negligence remains. Dr. Birusingh and The Iowa Clinic maintain their motion for JNOV should have been granted as to Zaw's informed-consent claim

---

[12] In its ruling on Dr. Birusingh and The Iowa Clinic's post-trial motions, the district court concluded that even if only one of the two theories of medical negligence was supported by substantial evidence, Dr. Birusingh and The Iowa Clinic were unable to obtain relief because they requested a general verdict form rather than special interrogatories asking the jury to find liability under each claim separately. The court cited case law about "invited error" for its ruling. *See, e.g.*, *Horak v. Argosy Gaming Co.*, 648 N.W.2d 137, 150 (Iowa 2002).

But we are persuaded that Dr. Birusingh and The Iowa Clinic did not invite this error. They strenuously and repeatedly objected to the jury being instructed as to the two separate theories of medical negligence. Stating they were forced to choose the lesser of the prejudicial choices once the district court incorrectly ruled against them, they made a strategic choice about the general verdict form.

because the claim was not supported by expert testimony nor substantial evidence. They focus on Zaw's alleged failure to produce expert testimony on the standard of care for disclosing the planned procedure to the patient. *See Kennis*, 491 N.W.2d at 165 ("Generally, when the ordinary care of a physician is an issue, only experts can testify and establish the standard of care and the skill required."); *see also id.* at 166 ("[A] claim of lack of informed consent is an issue beyond the common knowledge of laypersons and requires expert evidence.").

As we have already alluded, there were issues with Dr. Busky's expert testimony, which was admitted over Dr. Birusingh and The Iowa Clinic's objections.[13] "We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion." *Ranes v. Adams Lab'ys, Inc.*, 778 N.W.2d 677, 685 (Iowa 2010).

Turning to the informed-consent claim, Dr. Busky was twice allowed to testify to a standard of care that is at odds with the legal theory of lack of informed consent. The first time, Dr. Busky was asked, "Doctor, how important is it that a patient know what surgery is actually being done?" and he responded, "I think that's the standard of care." The second time, Dr. Busky said it was "correct" that "the standard is making sure that the patient understands." But when we consider whether substantial evidence supported the jury's finding Dr. Birusingh failed to obtain informed consent, the doctor's duty to impart information is based on

---

[13] For the reasons that follow, we agree with Dr. Birusingh and The Iowa Clinic that Dr. Busky's testimony on the standard of care was erroneously admitted. We do not, however, rely on that error as a separate ground for reversal because of our conclusion that no expert testimony was required to establish the standard of care for the informed-consent claim.

making a reasonable effort—not on whether the patient actually grasps the information. "[O]ne of the difficulties with analysis in terms of 'informed consent' is its tendency to imply that what is decisive is the degree of the patient's comprehension." *Canterbury*, 464 F.2d at 780 n.15; *see also Andersen*, 913 N.W.2d at 546 (citing *Canterbury*, 464 F.2d at 790, and referring to it as the "landmark informed-consent case"). It is legally incorrect to state that when a patient does not understand the procedure, the doctor has automatically breached the standard of care. *See Perin v. Hayne*, 210 N.W.2d 609, 613 (Iowa 1973) ("Where an injury may occur despite due care, a finding of negligence cannot be predicated solely on the fact it did occur."). Instead, "the physician discharges the duty when he [or she] makes a reasonable effort to convey sufficient information although the patient, without fault of the physician, may not fully grasp it." *Canterbury*, 464 F.2d at 780 n.15 ("[T]he focus of attention is more properly upon the nature and content of the physician's divulgence than the patient's understanding or consent."). "[T]he factfinder may have occasion to draw an inference on the state of the patient's enlightenment, [but] the factfinding process on performance of the duty ultimately reaches back to what the physician actually said or failed to say." *Id.* In other words, Zaw's failure to understand that Dr. Birusingh would be performing a vasectomy rather than a circumcision is not enough for Zaw to be successful on his informed-consent claim.

Taken literally, Dr. Busky's stated standard of care places strict liability on the doctor. *But cf. Tappe ex rel. Tappe v. Iowa Methodist Med. Ctr.*, 477 N.W.2d 396, 400 (Iowa 1991) (avoiding the inference of negligence without proof in a res ipsa theory as "while physicians control their surgical instruments and medicine,

they do not control the physical condition and reactions of their patients"). And, Zaw conceded as much in oral argument. The district court discounted the argument indicating it was "more of a semantic argument." But, semantics matter when the standard of care is described as the intended result because here the opinion leaves no room to evaluate the reasonableness of the doctor's actions. Thus, we hold that Dr. Busky cannot offer an opinion that the standard of care is the failure of Zaw to understand or any other iteration of that phrase.[14]

Yet, Zaw argues the action of informing a patient about which procedure is to be performed is so obvious that it is within the comprehension of a layperson's common knowledge and experience. The district court agreed with Zaw on this point.[15] Thus, we ask whether expert testimony on the standard of care in the medical community is required on the informed-consent theory under these facts. "There are two exceptions to the general rule that expert testimony is needed to establish negligence in a medical malpractice action." *Hill v. McCartney*, 590 N.W.2d 52, 56 (Iowa Ct. App. 1998). "The first exception is when the lack of care is so obvious it is within comprehension of a lay person. The second exception,

---

[14] Dr. Birusingh and The Iowa Clinic also raised objections to other testimony from Dr. Busky focused on how he might engage with a non-English speaking patient. In the context of establishing the standard of care, what he might have done as opposed to the standard medical community is irrelevant to the determination. *See DeBurkarte v. Louvar,* 393 N.W.2d 131, 133 (Iowa 1986) ("We agree with the defendant that testimony on what another physician would do is not sufficient to establish a standard of care.").

[15] In its ruling on post-trial motions, the court found there was expert testimony to establish the standard of care. The court also concluded, in the alternative, that "the duty of a physician to communicate with a patient to determine the patient's reason for visiting the doctor 'is so obvious as to be within the comprehension of a layperson and requires only common knowledge and experience to understand.'" (quoting *Bazel v. Mabee*, 576 N.W.2d 385, 387 (Iowa Ct. App. 1998)).

an extension of the first, is when the physician injured a part of the body not involved in the treatment." *Id.* Zaw and the court pointed to the first exception. As was noted in *Canterbury:*

> There is, by the same token, no basis for operation of the special medical standard where the physician's activity does not bring his medical knowledge and skills peculiarly into play. And where the challenge to the physician's conduct is not to be gauged by the special standard, it follows that medical custom cannot furnish the test of its propriety, whatever its relevance under the proper test may be. The decision to unveil the patient's condition and the chances as to remediation, as we shall see, is ofttimes a non-medical judgment and, if so, is a decision outside the ambit of the special standard. Where that is the situation, professional custom hardly furnishes the legal criterion for measuring the physician's responsibility to reasonably inform his patient of the options and the hazards as to treatment.

464 F.2d at 785 (footnotes omitted). We believe, here, a reasonable layperson could assess if the medical provider acted reasonably in attempting to describe the planned operative procedure. It is not a risk or the likelihood of that risk that is being discussed—it is simply "what is the operation that am I getting?" *See Pauscher v. Iowa Methodist Med. Ctr.*, 408 N.W.2d 355, 360 (Iowa 1987) ("[T]he patient ordinarily will be required to present expert testimony relating to the nature of the risk and the likelihood of its occurrence, in order for the jury to determine, from the standpoint of a reasonable patient, whether the risk is a material one."); *but cf. Bray v. Hill*, 517 N.W.2d 223, 226 (Iowa Ct. App. 1994) (holding plaintiff's daughter, who was a nurse, was not qualified to testify whether the medical standard of care required the doctor to have held a preoperative conference).

Here, a juror could evaluate if Dr. Birusingh communicated the procedure to Zaw based upon how the doctor testified about the process he used to inform. *Campbell v. Delbridge*, 670 N.W.2d 108, 111–12 (Iowa 2003) (holding issues of

credibility and communication about relying on an order for an infusion would not require expert medical testimony, while the decision about whether the infusion was necessary or was properly done would require such expertise).  Dr. Birusingh, when called as a witness in Zaw's case, said:

> I think we both know that you can't really make anybody understand anything, but it's my job to communicate the procedure, how it's going to be performed, the risks and the benefits, the alternatives, the possible complications, so that's what I try to do.

Then to follow-up, this exchange occurred:

> Q. Do you think it would be a major medical mistake if you did the wrong surgery because you did not make sure beforehand what surgery was required or what surgery was requested?  A. I think it's my job to make sure that I know what surgery or what procedure is being requested to the best of my ability with, as I've said, asking questions, presenting risks, complications, so forth.

The test is:

> [I]f all the primary facts can be accurately and intelligibly described to the jury, and if they, as [persons] of common understanding, are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar training, experience, or observation in respect of the subject under investigation, [expert testimony is not required].

*Thompson v. Embassy Rehab. & Care Ctr.*, 604 N.W.2d 643, 646 (Iowa 2000) (alterations in original) (quoting *Schlader v. Interstate Power Co.*, 591 N.W.2d 10, 14 (Iowa 1999)).  Under this test, we find the facts surrounding the doctor's duty to inform about the type of planned procedure to be the exception to the rule requiring expert testimony on the standard of care.

Finally, Dr. Birusingh and The Iowa Clinic assert the district court should have granted JNOV on the informed-consent theory because there was not substantial evidence of any negligence to submit the question to a jury.  As the jury

was instructed, Zaw had to prove all of the following to establish Dr. Birusingh failed to obtain informed consent:

> 1. The existence of material information concerning the vasectomy. Material information is information that would be significant to a reasonable patient's decision to consent to the procedure. Material information includes the risks of, alternatives to, and consequences of having or not having the procedure.
> 2. Material information concerning the vasectomy was unknown to Zaw Zaw.
> 3. Dr. Birusingh failed to disclose material information concerning the vasectomy to Zaw Zaw.
> 4. Disclosure of material information concerning the vasectomy would have led a reasonable patient in Zaw Zaw's position to reject the treatment.

Here, the material information Dr. Birusingh purportedly failed to disclose was the vasectomy itself. Dr. Birusingh and The Iowa Clinic assert that even if Zaw proved he was unaware of the vasectomy until after Dr. Birusingh performed it, Zaw did not establish that lack of knowledge was due to Dr. Birusingh's failure to disclose material information, so his claim fails.

Zaw also had to prove that Dr. Birusingh breached his duty to disclose. This duty is based "in negligence" and "impos[es] upon the doctor a duty reasonably to disclose [the material] information." *Pauscher*, 408 N.W.2d at 361. "A physician owes a duty to his [or her] patient to exercise the ordinary knowledge and skill of his or her profession in a reasonable and careful manner when undertaking the care and treatment of a patient." *Plowman v. Fort Madison Cmty. Hosp.*, 896 N.W.2d 393, 401 (Iowa 2017) (citation omitted).

Dr. Birusingh and The Iowa Clinic argue substantial evidence does not support a finding Dr. Birusingh breached the standard of care in obtaining informed consent, but this argument relies on the facts as Dr. Birusingh testified to them and

ignores the testimony of other witnesses, who were adverse to him. And our review requires us to view the evidence in the light most favorable to the nonmoving parties. *See Smith*, 851 N.W.2d at 18. Dr. Birusingh and Nurse Heideman testified at length about their discussion of the procedure with the interpreters and Zaw. And Siama—the interpreter at Zaw's first appointment with Dr. Birusingh—testified he had no clear recollection of Zaw's appointment specifically but he would have read the "consent for sterilization" form to Zaw before signing the interpreter's statement. Siama admitted he did not know what the word "vasectomy" meant at the time he was the interpreter for Zaw's appointment. And Zaw indicated he signed the form before meeting with the doctor. He was asked if he met with Dr. Birusingh at the time he signed the consent form, and Zaw testified:

> So, I go in the clinic, and the interpreter show me on the form, and he explain it to me, and I sign it on the paper. I sign it on the form. He asking me, You came to the clinic for what? And then I told him the reason I came to the clinic.

Zaw testified repeatedly that he signed the "consent for sterilization" form before meeting with Dr. Birusingh. He was asked if Dr. Birusingh was in the room when he signed it, and Zaw responded, "I remember I sign it outside, the paper." Another time, he responded, "I remember that outside the clinic when I came in with interpreter, I signed on the paper with interpreter." When asked again if Dr. Birusingh was present, Zaw said, "No, only me and interpreter." And in his deposition, Dr. Birusingh testified that the "consent for sterilization" form was not read to Zaw in the doctor's presence.

Other than providing Zaw with written forms about a vasectomy, it was disputed how much time Dr. Birusingh spent with Zaw explaining the procedure. Puia, the interpreter from the second day, testified neither Nurse Heideman nor Dr. Birusingh ever mentioned what surgery Zaw was receiving that day. He also testified there was no discussion of "permanent birth control," "risks of undergoing the surgery," "alternative methods," or "withdrawing consent." And there was testimony the second form, the "consent for vasectomy" form, was signed by Zaw after the procedure was already completed, in which case it would not have been part of disclosing the procedure. At trial, Puia testified it was his first time seeing the "consent for vasectomy" form that Zaw signed.

There were also questions raised about Dr. Birusingh's physical examination of Zaw and whether it was rushed. Dr. Birusingh's notes from Zaw's first appointment list a number of things Dr. Birusingh claimed he told Zaw about the procedure, but the physical exam portion of his notes failed to mention either the bead in Zaw's penis or the phimosis. Dr. Birusingh explained these conditions were not important to his examination related to the vasectomy.

Viewing the evidence in the light most favorable to the nonmoving parties, substantial evidence supported a finding Dr. Birusingh violated his duty in disclosing the procedure to Zaw. Thus, Dr. Birusingh and The Iowa Clinic were not entitled to a JNOV on the informed-consent theory.

**2. Statutory presumption of informed consent.**

In the alternative, Dr. Birusingh and The Iowa Clinic maintain they were entitled to JNOV because Zaw did not overcome the statutory presumption of informed consent. Iowa Code section 147.137 provides:

A consent in writing to any medical or surgical procedure or course of procedures in patient care which meets the requirements of this section shall create a presumption that informed consent was given. A consent in writing meets the requirements of this section if it:

1. Sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, or disfiguring scars associated with such procedure or procedures, with the probability of each such risk if reasonably determinable.

2. Acknowledges that the disclosure of that information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner.

3. Is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent, is signed by a person who has legal authority to consent on behalf of that patient in those circumstances.

But this statute merely creates a presumption of informed consent, and that presumption is rebuttable. *See Andersen*, 913 N.W.2d at 539. The jury could properly find the presumption was rebutted based on the evidence Zaw signed the "consent for sterilization" form with other paperwork, before he met with either Dr. Birusingh or Nurse Heideman, not understanding it was a consent for a surgery. A jury could also find he did not sign the second consent form until after the vasectomy was already completed and he was unaware of the form's meaning.

**3. Parties.**

LANGUAGEtech argues that even if a new trial is necessary, it should be excluded from the proceeding because the jury found it had no fault. "It is possible for a new trial to be granted as to less than all the defendants involved in a case." *Jack v. Booth*, 858 N.W.2d 711, 718 (Iowa 2015); *see also* Iowa R. Civ. P. 1.1004 ("On motion, *the aggrieved party* may have an adverse verdict, decision, or report

or *some portion thereof* vacated and a new trial granted if any of the following causes materially affected movant's substantial rights . . . ." (emphasis added)).

In deciding whether LANGUAGEtech should remain a party at the next trial, we consider whether the issues are "so intertwined as to necessitate a new trial for both." *Jack*, 858 N.W.2d at 720 (citation omitted). And we ask if the district court's erroneous jury instruction tainted the jury's verdict as to LANGUAGEtech. *See Whitlow v. McConnaha*, 935 N.W.2d 565, 570 (Iowa 2019) (concluding a party was properly excluded from new trial because the court "[saw] no basis for concluding that the jury's finding [the party] was not at fault resulted from a compromise verdict or was otherwise tainted by the erroneous instruction on the verdict form"). Plus, we keep in mind that "[t]he general rule is that when a new trial is granted, all issues must be retried." *Id.* (citation omitted).

It is not difficult to rationalize the no liability finding of the interpreters on this record. On the one hand, a jury might have found if Dr. O'Shea could effectively communicate with Zaw about a circumcision, irrespective of the interpreter, Dr. Birusingh should have been able to ascertain what procedure Zaw required. So one can argue the negligence is not intertwined so that LANGUAGEtech should be part of the next trial. Still, given the strict liability opinion of Dr. Busky, a jury might also find it had no choice but to find Dr. Birusingh liable. Because the issue of Dr. Birusingh's alleged negligence and the alleged negligence of the interpreters is so intertwined, and because we think the court's erroneous decision to instruct on the negligent-communication theory may have impacted the jury's decision as to who was at fault, we are convinced that all of the issues must be retried, with all of the parties—including LANGUAGEtech.

**4. Allocation of Juror Strikes.**

"Because we find the case must be remanded for a new trial, we will consider any remaining issues that may arise again on retrial." *Kinseth v. Weil-McLain*, 913 N.W.2d 55, 73 (Iowa 2018).

Iowa Rule of Civil Procedure 1.915 governs the procedure for impaneling a jury, and rule 1.915(7) provides:

> Each side must strike four jurors. Where there are two or more parties represented by different counsel, the court in its discretion may authorize and fix an additional number of jurors to be impaneled and strikes to be exercised. After all challenges are completed, plaintiff and defendant shall alternately exercise their strikes.

Here, the district court allowed Zaw to have four strikes; while Dr. Birusingh and The Iowa Clinic, collectively, were given three; and LANGUAGEtech was given three. Dr. Birusingh and The Iowa Clinic argue this was an abuse of discretion because Iowa Rule of Civil Procedure 1.915(7) requires "each side" to receive at least four strikes, while they received the reduced number of only three. The district court reasoned Dr. Birusingh (and The Iowa Clinic) and LANGUAGEtech were both defendants, and combined they received six juror strikes—more than the four-strike minimum the rule requires. Dr. Birusingh and The Iowa Clinic challenge this reasoning, arguing that as they were adverse to LANGUAGEtech, they should not have been grouped with them in counting the number of strikes.

The case law on this issue is sparse. In *Morales v. Miller*, No. 09-1717, 2011 WL 222527, at *2 (Iowa Ct. App. Jan. 20, 2011), the district court gave four strikes to the plaintiff-patient and to each of the separate defendants. The patient challenged the decision, arguing "the defendants' interests were so closely aligned

they had to be considered one defendant for purposes of peremptory strikes." *Morales*, 2011 WL 222527, at *3. A panel of this court found no abuse of discretion, noting "[t]he alleged bases for liability as to [the two sets of defendants] were different, arising from different sets of alleged acts and omissions." *Id.* at *3.

Similarly, in *In re Estate of Gooden ex rel. Gooden v. Davis County*, No. 09-0861, 2010 WL 3894158, at *2–3 (Iowa Ct. App. Oct. 6, 2010), the estate brought claims against two separate defendants—the county and an individual. The district court granted both the county and the individual four peremptory strikes each, which the estate challenged on appeal, arguing the two defendants should have shared the four strikes. *Gooden*, 2010 WL 3894158, at *2. A panel of this court found the district court properly exercised its discretion under the rule, as "[t]here [was] no question the defendants here were separate parties represented by different counsel." *Id.* at *3. Additionally, the court concluded "the estate [was] unable to show it was prejudiced by the grant of four strikes to each of the defendants," which the court concluded the estate was required to do to receive a new trial. *See id.*

Here, Dr. Birusingh and The Iowa Clinic are adverse to LANGUAGEtech, which they sued to bring into the case. And like *Morales*, "[t]he alleged bases for liability as to [the two sets of defendants] were different, arising from different sets of alleged acts and omissions." 2011 WL 222527, at *3. For these reasons, at the new trial, Dr. Birusingh (and The Iowa Clinic) and LANGUAGEtech should each get four peremptory strikes.

**IV. Conclusion.**

Because of the errors outlined above, we reverse the judgment and remand for a new trial on the informed-consent claim with all parties.

**REVERSED AND REMANDED FOR NEW TRIAL.**